[File No. 7300]

IVER SOLBERG, on behalf of himself and all others similarly situated, Respondent, v. THE STATE TREASURER, as Trustee for the State of North Dakota, and The Bank of North Dakota, its Agent, and the Industrial Commission of the State of North Dakota, Appellants.

(53 NW2d 49)

Opinion filed April 24, 1952

*E. T. Christianson,* Attorney General, *C. E. Brace,* Assistant Attorney General, and *Robert A. Birdzell,* Special Assistant Attorney General, for appellants.

*E. C. Rudolph* and *Clyde Duffy,* for respondent.

BURTNESS, Dist. J. In this action the plaintiff seeks to compel the defendants (the State Treasurer as trustee of the State of North Dakota, the Bank of North Dakota, its agent, and the Industrial Commission of the State of North Dakota) to release to the plaintiff the reservation of 50% of oil, natural gas and minerals on or underlying approximately 90 acres of land in Williams County, North Dakota.

The facts involved are undisputed and may be summarized as follows:

In September 1937 the plaintiff and his wife had defaulted in the payment of their mortgage indebtedness upon the lands involved and therefore on September 28, 1937 in payment of such indebtedness conveyed, by quitclaim deed, said lands, as an absolute conveyance and not as security, to the State Treasurer, as trustee for the State of North Dakota, which quitclaim deed was promptly thereafter duly recorded.

Thereafter on February 26, 1946 the State Treasurer, as

trustee for the State of North Dakota, made, executed and delivered to the said plaintiff, Iver Solberg, from whom it derived title, its State Treasurer's Deed to the said above described lands, but "reserving and excepting" to the State of North Dakota fifty (50%) per centum of all oil, natural gas and minerals which may be found on or underlying the said above described lands including fifty (50%) per centum of rentals and other income from leases thereof" and which said State Treasurer's Deed was likewise duly recorded.

Such lands were repurchased by the plaintiff pursuant to his written offer to do so under the provisions of section 38-0901 NDRC 1943 then in effect, which had been enacted in 1941 (Chapter 165 Session Laws of 1941 enacted as an emergency measure, approved February 20, 1941) reading as follows:

"In every transfer of land, whether by deed, contract, lease, or otherwise, by the state of North Dakota, or by any department thereof, fifty per cent of all oil, natural gas, or minerals which may be found on or underlying such land shall be reserved to the state of North Dakota. Any deed, contract, lease, or other transfer of any such land made after February 20, 1941, which does not contain such reservation shall be construed as if such reservation were contained therein. The provisions of this section shall apply to all lands owned by this state or by any department thereof regardless of how title thereto was acquired."

The reservation in the deed of February 26, 1946 was in the following language:

"Reserving and excepting, however, to the state of North Dakota, fifty (50%) per centum of all oil, natural gas and minerals which may be found on or underlying said lands, including fifty (50%) per centum of rentals and other income from leases thereof, as provided by Section 38-0901 RC and further reserving and excepting title to all archaeological materials, whether found upon or below the surface of said lands, as provided by Section 55-0306 RC and further excepting minerals, oil, gas, coal, and rights to any or all thereof, wherever such substances or rights are not now owned by the party of the first part accord-

ing to the records in the office of the Register of Deeds of said County and State."

The purchase price has long since been paid by the plaintiff, Iver Solberg, and on February 28, 1951 said plaintiff was, and is now, the owner in fee simple and in possession of said lands, subject to the reservation contained in the conveyance to him.

On February 28, 1951 the Governor of North Dakota approved Chapter 231 of the Session Laws of 1951 enacted by the legislative assembly reading as follows:

"(§ 1) Whenever the state or any of its departments sell lands to any person, from whom the state derived the title to such lands, or to his spouse or to his lineal descendants in the first degree, the lands shall be sold free of any reservation of minerals provided for in section 38–0901 of the North Dakota Revised Code of 1943 or in chapter 149 of the 1939 session laws.

"(§ 2) Where the state or any of its departments have, subsequent to March 12, 1939, sold lands to any person from whom the state derived title to such lands, or to his spouse or to his lineal descendants in the first degree, and such purchaser or his spouse or his lineal descendants in the first degree are the owners of such lands at the date of the passage of this Act, the state and its departments shall release to such person any reservation of minerals made under section 38–0901 of the North Dakota Revised Code of 1943, or under chapter 149 of the 1939 session laws.

"(§ 3) When the purchase price of such lands has been fully paid to the state or its departments, an instrument evidencing such release shall be furnished on application and payment of fees under rules to be prescribed by the state and its departments, but in no case shall the fee therefor exceed ten cents an acre.

"(§ 4) Pending application and payment of fee under section 3, the state and its departments may continue to lease reserved minerals and to collect rentals and other income from such leases, and where lands have been sold on contract for deed, such rentals and other income shall be applied as payment on the contract for deed. On release of minerals reserved, any unexpired mineral leases and rentals and income thereafter bcoming due shall

be assigned to the person entitled to the release as prescribed in sections 2 and 3 hereof."

On September 4, 1951 the plaintiff, Iver Solberg, made written demand and request upon the State Treasurer, as Trustee for the State of North Dakota and the Bank of North Dakota, its agent, and the Industrial Commission of the State of North Dakota for a release and conveyance to him of the mineral acres reserved by the State Treasurer, as Trustee for the State of North Dakota, and at the same time tendered to the State Treasurer, as Trustee for the State of North Dakota, for the release of the said reserved oil, natural gas and minerals on or underlying the said lands of this plaintiff the sum of $9.55, the required fee, based on ten cents an acre.

On September 8, 1951, the Bank of North Dakota, agent for the State Treasurer as Trustee for the State of North Dakota, in writing rejected and denied the application of the plaintiff, Iver Solberg, for such release and conveyance.

It was stipulated at the trial that the reserved minerals and oil and gas were at all times held as security for bonds of North Dakota, Real Estate Series, issued under statute, now Chapter 54–30 NDRC 1943, large amounts of which bonds are presently outstanding and unredeemed, and that the said reserved minerals have a present fair market value exceeding the sum of Ten Dollars ($10.00) per acre, or a total of about Nine Hundred Fifty Dollars ($950.00).

The learned District Court ordered judgment to be entered in favor of the plaintiff that the defendant, the State Treasurer, as Trustee for the State of North Dakota, shall release and convey to the plaintiff, Iver Solberg, the 50% of all oil, natural gas and minerals which may be found on or underlying the lands belonging to the said plaintiff, to-wit: (then describing land by legal description), being 96.5 mineral acres, together with 50% of rentals and other income from leases thereof, reserved by the State Treasurer, as Trustee for the State of North Dakota, in its deed to the said plaintiff, Iver Solberg, made and executed on the 26th day of February, 1946, and duly recorded in the office of the Register of Deeds of Williams County, North Dakota, in Book 91 of Deeds on page 363.

The appeal of the defendants is from the whole of said judgment and demands trial anew of the entire case.

In their answer the defendants, among other defenses, allege that chapter 231 of the 1951 session laws of the state is null and void and without legal effect in that same is contrary to the provisions of section 20 and of section 185 of the Constitution of North Dakota.

We are met at the outset by the contention of the plaintiff-respondent that the constitutionality of the statute involved cannot be challenged by the defendants as their rights are not affected and therefore they have no legal interest in defeating the act. In this contention respondent relies upon the holding of this court in State v. Baker, 74 ND 244, 21 NW2d 355.

In that case, involving the question as to whether the state auditor could be compelled to draw warrants for money claimed to be due members of the legislature under an act granting them three hundred dollars as reimbursement for living expenses for each legislative session, this court held that the state auditor was merely a ministerial officer and was not in a position to question the constitutionality of the act. There were two factors in that case supporting such holding. One was that the real duty of saying whether claims not otherwise directed to be paid are proper and shall be paid, devolves upon the auditing board and not upon the auditor. Claims for legislative expenses such as were involved in that case are audited, approved and directed to be paid by legislative action and therefore the auditor's duty becomes purely ministerial. The other factor emphasized in the decision was that the attorney general, also a constitutional officer, is the law officer of the state and has the duty to advise other state officers and, when requested, to "give written opinions on all legal and constitutional questions relating to the duties of such officers", and that the attorney general had rendered his opinion to the legislative assembly that the act involved was one within the power of the legislature to enact, of which opinion the auditor was fully apprised.

In the instant case the situation is very different from that in the Baker case. The attorney general on June 12, 1951 ren-

dered a written opinion, the last paragraph of which reads as follows:

"By reason of the doubt in our minds as to the constitutionality of the law and by further reason that it involves a considerable amount of property, we believe that the constitutionality of this act should be tested in the courts, and in order that this may come about, as well as for reasons herein set forth, we hold that Senate Bill 220 is in contravention of Sections 185 and 20 of the Constitution and, therefore, unconstitutional."

The most important defendant in this case is the state treasurer, as "trustee for the State of North Dakota." Under the provisions of section 54–3002 NDRC of 1943, real estate mortgages negotiated by the Bank of North Dakota must, within certain limits, be assigned to "The state treasurer of North Dakota, and his successors in office in trust, as security for bonds to be issued under the designation of bonds of North Dakota, real estate series, as provided by law". Under the provisions of section 54–3010 NDRC 1943, the faith and credit of the State is pledged for the payment thereof.

It seems clear that the instant case is readily distinguishable from the case of State v. Baker, supra. In fact, it comes clearly within the reasoning of the court in the early case of McDermont v. Dinnie, 6 ND 278, 69 NW 294, wherein this court held that the defendants therein, the mayor and auditor of the city of Grand Forks, could raise the issue of constitutionality as they were municipal officers "charged by their oaths of office with the duty of protecting the funds of the municipality" that "it would be a violation of their official duty should they proceed to pay out the funds of the city upon unwarranted and illegal claims" and also that the "writ cannot be invoked to compel an officer to do an illegal act".

In Department of State Highways v. Baker, 69 ND 702, 290 NW 257, 129 ALR 925, decided in 1940, where the state auditor, acting on the advice of the attorney general, justified her refusal to perform a statutory duty on the ground of unconstitutionality, this court held that under such circumstances and involving the public revenue of the state, the state auditor could raise such issue.

Other decisions of this court are summarized and analyzed in both the majority and the dissenting opinions in State v. Baker, supra. We find nothing in them which is inconsistent with now holding, as we do, that the defendants are in a position in this case to question the constitutionality of Chapter 231 of the 1951 session laws.

In view of our final conclusions, we need consider only the question as to whether the statute referred to violates the provisions of section 185 of said constitution, which reads as follows:

"The state, any county or city may make internal improvements and may engage in any industry, enterprise or business, not prohibited by article 29 of the constitution, but neither the state nor any political subdivision thereof shall otherwise loan or give its credit or make donations to or in aid of any individual, association or corporation except for reasonable support of the poor, nor subscribe to or become the owner of capital stock in any association or corporation."

Does section 2 of Chapter 231 of the session laws of 1951 "make donations" to or in aid of "an individual"?

The lands in question became the property of the state when conveyed to it unconditionally. The plaintiff repurchased the land specifically subject to a reservation to the state of 50% of all oil, natural gas and minerals. Presumably the purchase price was agreed to on that basis and understanding. The plaintiff accepted a conveyance which included that reservation in specific language which could not be misunderstood. All this was done in accordance with the law then in effect (sec 38–0901 NDRC 1943). When the 1951 legislative assembly enacted Chapter 231 the state owned 50% of the oil, natural gas and minerals therein. In the case at issue such reserved minerals had a market value of about $950.00 when the plaintiff asked for a release and a conveyance thereof to him.

As hereinbefore pointed out, such retained mineral rights are still held in trust as security for the real estate series of bonds issued by the state and the faith and credit of the state is pledged for the payment of such bonds. Consequently the reservation

remains at least a partial protection or reimbursement to general taxpayers against losses and ultimate liability for a deficit.

It may be significant to note that under the statute involved (sec 2 of chapt 231, session laws of 1951) it is only the persons from whom the state derived title, their spouses or their lineal descendants in the first degree and who are the owners of the land at the date of the passage of the act, who are granted a special privilege and become entitled to a release of the reservation. It does not apply to others who have purchased any of such lands, nor is the release granted to the original owner unless he has repurchased. It does not even apply to those otherwise qualified who have purchased or repurchased any of such lands and have disposed of them to someone else before the passage of the act, nor to their grantees.

Obviously the act does not provide for any money consideration to be paid the state.

Is there a moral or equitable obligation on the state sufficient to support the granting of this privilege by the statute? When lands were purchased by any one of the privileged class prior to the enactment of the statute involved it was done under the law then in effect, under the specific provision that the state would reserve 50% of the oil, natural gas and minerals which might be found on or underlying such land. There is no requirement in the law that the purchase price had to equal the amount that the state had invested in the land. During the period the state owned the land it was exempt from taxation with the result that during such period the state, counties, townships and school districts were deprived of such tax revenue, creating a greater burden upon taxpayers generally. That there is no moral or equitable obligation on the part of the state sufficient to create a consideration for a release of the reservation, is clear.

If section 2 of the act is operative, it has the effect of transferring to certain designated classes or individuals property of the state, held in trust for all the people thereof, as a gift. In other words, by the terms thereof the state "makes donations to or in aid of" an "individual", in violation of the provisions of section 185 of the state constitution hereinbefore quoted.

A very similar case, Herr v. Rudolf, 75 ND 91, 25 NW2d 916,

involving the identical principle, but a different statute (sec 6–0931, NDRC 1943, enacted as chapt 205, session laws 1943, subsec 2 thereof) was decided by this court on January 22, 1947. That statute also related to lands which had become the property of the state through foreclosure of mortgages given in connection with loans from the Bank of North Dakota pursuant to the provisions of chapt 6–09 NDRC 1943 and assigned to the State Treasurer in trust as security for so-called North Dakota Real Estate Series Bonds pursuant to provisions of Chapt 54–30 ND RC 1943. The statute involved attempted to give former owners, their lineal descendants and their tenants at the time of the passage of the act the right to purchase such lands at the appraised value thereof before the holding of the public sale otherwise provided for without having to take a chance that the bidders at the public sale might pay considerably more.

In that case the plaintiff contended that the statute referred to violated both sections 20 and 185 of the state constitution. This court held that it violated both of such sections. In the case at bar the court concerns itself only with section 185. In Herr v. Rudolf this court said:

"The plaintiff further insists that the statute violates Section 185 of the Constitution of North Dakota in that it makes a donation to a privileged buyer by enabling him to buy at the appraised value, though others are ready and willing to pay a greater price. We think the contention is well grounded. The instant case clearly demonstrates this. The plaintiff offers to pay $2600 for this particular tract of land and is ready and willing to buy it at whatever amount it may be necessary for him to bid up to $3000. Yet, under the statute, the defendant Rudolf is granted the privilege to buy it for $2500, and the defendants, the State Treasurer as trustee, the Bank of North Dakota, and the members of the Industrial Commission, have conceded this right and intend to and will sell the land to Rudolf at the latter figure. As a consequence the trust fund will suffer a certain loss of $100 and a possible loss of $500 and the State must make this loss good. Thus Rudolf in effect will receive a donation from the State in the amount of the loss contrary to the prohibition contained in Section 185 of the Constitution."

What appears as a well reasoned opinion is that of the Kansas Supreme Court in Winters v. Myers, 92 Kan 414, 140 Pac 1033. That case involved the validity of the following provision:

"The word 'island' as used in this act, means and shall be held to be a tract of land which is entirely surrounded by the current of the stream in which it is situated when at its ordinary low stage, and any islands which have been formed and attached to the land or banks along such streams, and which have not been islands as herein defined during the twenty years last past, are hereby declared to be accretions to and belonging to, and parts of the lots and lands to which they have become attached." Laws 1913, Chapt 295, sec 9.

Under existing law the islands which the act declared should become part of lots and lands to which they had become attached were the property of Kansas and the effect of the act was to relinquish the title of the state to such islands and to vest them in the owners of the land or banks along the stream to which they had attached. The Supreme Court of Kansas held that this constituted relinquishment or gift in violation of sec 2 of the Bill of Rights of Kansas which provided that free governments are instituted for the equal protection and benefit of the people. The provisions in the Bill of Rights invoked in the Kansas case were not as specific as the provisions of sec 20 of the Constitution of North Dakota which forbids the legislature from granting any privileges to any citizen or class of citizens which upon the same terms shall not be granted to all citizens. Apparently Kansas does not have a provision like sec 185 of the North Dakota Constitution which forbids the state to make donations to or in aid of any individual, association or corporation except for the reasonable support of the poor. We have examined the Constitution of Kansas and are unable to find any similar provision. We quote the following from the opinion:

"A statute which has the effect of thus transferring the property of all the people, without compensation or public advantage, to a few, denies the equal protection and benefit to the people for which government is instituted, as declared in the Bill of Rights. Equal protection is defeated by a gift of that which belongs to all as effectually as by compelling a contribution from

all, which, as we have seen, the authorities do not permit. While this protection is usually sought by the few against the many, no reason is perceived why it may not be invoked in behalf of the people at large against legislation which would bestow their property upon the few. This provision of the Constitution, as we have seen, while declaring a political truth, does not permit legislation which trenches upon the truth thus affirmed. To this extent, at least, it must, like other constitutional provisions, be interpreted with sufficient liberality to carry into effect the principles of government which it embodies. State v. Sessions, 84 Kan 856, 115 Pac 641, 22 Ann Cas 796. It is concluded that section 9 of chapter 295 of the Laws of 1913, if held to be operative, would have the effect to transfer islands which are the property of the state, held in trust for the benefit of all the people, to the riparian owner without compensation, and is therefore unconstitutional."

In view of the recent decision in Herr v. Rudolf, supra, it is not important to cite other authorities, but see also: Hume v. Rogue River Packing Co. et al., 51 Or 237, 92 Pac 1065, 31 LRA NS 396; Illinois Central Railroad v. Illinois, 146 US 387, 13 S Ct 110, 36 L Ed 1018; Priewe v. Wisconsin State Land & Improvement Co., 103 Wis 537, 79 NW 780, and earlier Wisconsin cases cited therein. 59 Corpus Juris pp 202 to 206.

For the reasons above set out we hold that section 2 of chapt 231 of the session laws of 1951 and such other portions of the act as are intended to carry said section 2 into effect are contrary to the provisions of section 185 of the Constitution of this state.

Accordingly, the judgment of the district court is reversed and the action ordered dismissed.

MORRIS, C. J., and BURKE, SATHRE and CHRISTIANSON, JJ., concur.

GRIMSON, J., being disqualified, did not participate, O. B. BURTNESS, Judge of First Judicial District, sitting in his stead.