STATE of North Dakota and the Carter Oil Company, a corporation, Plaintiffs and Respondents,

v.

The AMERADA PETROLEUM CORPORA-TION, a corporation, Defendant and Appellant,

and

Ernest Bylin; Alma L. Bylin, his wife; E. A. Moline and Mabel H. Moline, his wife; Lars Kvam; Mattie M. Moe; Martha Iverson; Hilda Ramberg; Inga L. Kjerstad; Mary K. Nelson; Ida G. Moe; Agnes K. Haakenson; Peter Kvam; Edward Kvam; and all other persons unknown claiming any estate or interest in or lien or encumbrance upon the property described in the complaint, Defendants.

No. 7468.

Supreme Court of North Dakota.

Aug. 3, 1955.

Cox, Cox, Pearce & Engebretson, Bismarck, for appellant Amerada Petroleum Corporation.

Duffy & Haugland, Devils Lake; and Bjella & Jestrab, Williston, for respondent Carter Oil Company.

Paul Benson, Atty. Gen., for respondent State of North Dakota.

Aylmer & Butts, Jamestown, for defendants, Ernest Bylin, E. A. Moline and Mabel H. Moline, his wife.

Walter O. Burk, Williston, for defendant Lars Kvam.

GRIMSON, Judge.

This is an action to determine adverse claims to the Southeast Quarter of the Southwest Quarter (SE¼ of SW¼) and Lot Four (4) of Section Eighteen (18); the Northeast Quarter of the Northwest Quarter (NE¼ of NW¼) and Lot One (1) of Section Nineteen (19), all in Township One Hundred Fifty-six (156), North, Range Ninety-five (95) West of the 5th. P.M.

The complaint is in the statutory form. It sets out that plaintiffs have an estate and interest in property, challenges the defendants to set out the claims they make to the property and asks that such claims may be found invalid.

All of the defendants make a general denial to the allegations of the plaintiffs' claim of any estate or interest in the land. The defendant, Lars Kvam, in his separate answer sets out the purchase of this land from the State of North Dakota by a quitclaim deed. The plaintiffs reply with a general denial but admit the execution of said deed. Defendant, Amerada Petroleum Corporation, in its answer sets out the ownership of an oil and gas lease on the premises given by Lars Kvam to A. M. Fruh and Thomas W. Leach and assigned to the Amerada Petroleum Corporation. Plaintiffs reply thereto admitting the execution of said lease but deny all claims of the defendants. The defendants, Ernest Bylin, E. A. Moline and Mabel H. Moline answer jointly setting out the ownership of Ernest Bylin of a mineral deed to an

undivided 10/143rds interest in all the oil, natural gas and other minerals in said land and the ownership of E. A. Moline of a deed to an identical interest in said land, both deeds executed by Lars Kvam. Plaintiffs reply admitting the deeds but denying the claim of the defendants.

No answer or appearance is made by any of the other defendants.

The case was tried to the court who awarded a judgment in favor of the plaintiffs quieting title of the land in the state subject to the oil and gas lease of the Carter Oil Company. The defendants, Lars Kvam and the Amerada Petroleum Corporation appeal, demanding a trial de novo.

The facts are stipulated. Briefly, they show that on August 8, 1929, Ernest Bylin was the owner in fee simple of the land in controversy. On that date he and his wife executed a real estate mortgage to the State of North Dakota to secure a loan of $1,200. The money so loaned was from a trust fund held by the state for the Hospital for the Insane at Jamestown. Default was made in the payments under this mortgage and a foreclosure was had. No redemption was made. Sheriff's deed was issued to the State of North Dakota on August 21, 1941, and duly recorded in the office of the Register of Deeds of Williams County on September 25, 1941.

An examination of the land by agents of the Board of University and School Lands was made in 1941 and again in 1944. The land was duly appraised at $1,800.

Lars Kvam, then a tenant of the state on this land but not related to Ernest Bylin, made application to purchase said land on August 23, 1944, at the minimum price of $1,800. Thereupon a public sale of said land was advertised and Ernest Bylin, as former owner, was notified of the proposed sale, and that he was entitled to repurchase until three days before the sale. He answers: "I would be interested in knowing the amount required for me to redeem this property before sale, as I might wish to repurchase." After some correspondence an agreement was consummated whereby Bylin agreed to pay $2,055 for the land. A contract was entered into September 28, 1944, and $411, twenty (20) percent of the purchase price, was paid. The record shows that this was done under Sec. 15-0715(5), NDRC 1943. A reservation by the state of 50 percent of the oil, gas and minerals, under Section 38-0901, NDRC 1943, was contained in that contract. Mr. Kvam was notified and the public sale was abandoned. On Oct. 3, 1945, Ernest Bylin assigned his contract to Lars Kvam, and on his payment of the balance due on the contract, the State of North Dakota, on December 8, 1945, issued its quitclaim deed to the premises to Lars Kvam "to fulfill and complete the terms of that * * * certain contract for deed" dated September 28, 1944. On Nov. 23, 1949, Lars Kvam executed an oil and gas lease to A. M. Fruh and Thomas W. Leach, which they on Jan. 25, 1950, assigned to the Amerada Petroleum Corporation. He also gave the mineral deed to Bylin and Moline described in their answer.

On October 1, 1952, the State Land Commissioner advertised sale of oil and gas leases on real estate, including the premises in question and upon said sale, and in accordance therewith, on October 28, 1952, entered into a preliminary, five year, oil and gas lease with the Carter Oil Company, covering a one-half interest in the oil and gas on the premises involved, for a consideration of 25 cents per acre and a bonus of $76,862.50 and retaining the customary one-eighth ($\frac{1}{8}$) royalty.

In combating the claims of the defendants which arise out of the repurchase of the land by Bylin the plaintiffs contend that the statute, Sec. 15-0715(5), NDRC 1943 under which said repurchase was made is unconstitutional and that the proceedings under it were therefore void. The defendants and appellants contend that the plaintiffs have no right to attack the constitutionality of that statute under the evidence in this case. As a first ground for that claim the appellants question the right of an officer of the state to make such an attack and cite State ex rel. Johnson v. Baker, 74 N.D. 244, 21 N.W.2d 355.

■ The case at bar is an action to quiet title brought by the state itself under Chapter 32–17, NDRC 1943. It is an action to determine adverse claims in property in which the state, and the Carter Oil Company claim to have an interest. It is not an action directly brought to raise any constitutional question. The constitutionality question is raised incidentally in the determination of such claims. It is brought by the attorney general who is authorized by Section 54–1202, NDRC 1943, to institute and prosecute all cases in which the state is a party whenever in his judgment it would be for the best interests of the state so to do. It differs from the case of State v. Baker, supra, where the constitutional question was directly raised in the pleadings by a ministerial officer.

The appellant's next objection is that the question of constitutionality cannot be raised because this action is not brought directly to determine that issue and that there is no pleading claiming unconstitutionality directly; nor is there a direct request to set aside the proceedings by which Bylin repurchased.

■ An action to quiet title is a direct action for the purpose of determining what, if any, interest each of the parties have in the land involved. The statutory complaint is sufficient for the commencement of an action. We held in Spencer v. Beiseker, 15 N.D. 140, 107 N.W. 189, 190, "In other words, the statute dispenses with the necessity of framing issues by a proper pleading as in other actions, and requires the court to determine 'the validity, superiority and priority' of the claims set up without a pleading assailing their validity."

In Wilson v. Polsfut, 78 N.D. 204, 49 N.W.2d 102, 104, this court sets out the nature of an action to quiet title as follows:

"In an action to quiet title 'The court in its decision shall find the nature and extent of the claim asserted by the various parties, and shall determine the validity, superiority, and priority of the same.' Sec. 32–1710, NDRC 1943. Both contesting parties in this action

have asked for complete, equitable relief and a determination of their respective claims regarding the tract of land in controversy. A court of equity has authority to grant as full relief as is sought by the pleadings and within the scope of proof. Styles v. Dickey, 22 N.D. 515, 526, 136 N.W. 702; 44 Am.Jur., Quieting Title, Sec. 94, p. 79."

The defendants and appellants further claim that the plaintiffs have no right to raise any constitutional questions because they have not shown that they have been injured or affected by the transaction under the statute involved.

■ This court has always given the most careful consideration to questions involving the interpretation and application of the constitution. The legislature is a coordinate body of our government and its acts are presumed to be constitutional. While the supreme court is given the power to pass upon the constitutionality of legislation it must do that with caution, even reluctance. As a general rule the courts do not pass upon the constitutionality of an act unless a decision on that point is absolutely necessary for the determination of the case. A thorough discussion of these principles is made by Judge Christianson in State v. First State Bank, 52 N.D. 231, 242, 202 N.W. 391.

"As a general rule courts will not pass upon a constitutional question and decide a statute to be invalid unless a decision upon that very point becomes necessary to the determination of the case. A court will not listen to an objection to the constitutionality of an act by a party whose rights it does not affect. The statute is assumed to be valid unless someone complains whose rights it invades." Cooley Constitutional Limitations, Vol. 1, p. 332.

"One of the elementary doctrines of constitutional law, firmly established by the authorities, is that the constitutionality of a legislative act is open to attack only by a person whose rights are

affected thereby. Before a law can be assailed by any person on the ground that it is unconstitutional, he must show that he has an interest in the question in that the enforcement of the law would be an infringement on his rights. Assailants must therefore show the applicability of the statute and that they are thereby injuriously affected. The burden of proof is upon those who claim themselves harmed by a statute to show how, as to them, the statute is unconstitutional." 11 Am.Jur., Constitutional Law, Section 111, p. 748. See also 16 C.J.S., Constitutional Law, § 76, p. 157.

This court early adopted that principle. In State v. McNulty, 7 N.D. 169, 73 N.W. 87, this court said: "It is a well-established and wholesome rule of law that no one can take advantage of the unconstitutionality of any provision who has no interest in and is not affected by it."

That principle was reaffirmed in State ex rel. McClory v. Donovan, 10 N.D. 203, 210, 86 N.W. 709; Turnquist v. Cass County Drain Com'rs, 11 N.D. 514, 92 N.W. 852; State ex rel. Hughes v. Milhollan, 50 N.D. 184, 195 N.W. 292; Minot Special School Dist. No. 1, v. Olsness, 53 N.D. 683, 208 N.W. 968, 45 A.L.R. 1337; Anderson v. Byrne, 62 N.D. 218, 242 N.W. 687; State ex rel. Linde v. Taylor, 33 N.D. 76, 156 N.W. 561, L.R.A.1918B, 156; State ex rel. Kaufman v. Davis, 59 N.D. 191, 229 N.W. 105; King v. Baker, 69 N.D. 581, 288 N.W. 565, 125 A.L.R. 730; State ex rel. Johnson v. Baker, 74 N.D. 244, 21 N.W.2d 355.

Plaintiffs' ground for challenging the constitutionality of Section 15–0715(5) supra, under which the resale to Bylin was made is that it grants the right of repurchase only to bona fide farmers "residing upon the land". That is said to be an unreasonable and unjustifiable classification and unconstitutional under Section 20 of the constitution which provides that no citizen or class of citizens shall "be granted privileges or immunities which upon the same terms shall not be granted to all citizens." It is claimed Section 15–0715(5) unjustifiably discriminates against the mortgagor or former owner, his widow and lineal descendants who are not bona fide farmers residing upon the land and are therefore not granted the privileges of repurchasing the land.

That a statute is unconstitutional on the ground that it is discriminatory can only be raised by one belonging to a class so discriminated against. They are the only ones who can be adversely affected thereby. Neither the State of North Dakota nor the Carter Oil Company belong to those classes. They cannot, therefore, raise the question of the constitutionality of that statute on that ground.

In Olson v. Ross, 39 N.D. 372, 382, 167 N.W. 385, 386, this court says:

"It is well settled that a person who is seeking to raise the question as to the validity of a discriminatory statute has no standing for that purpose, unless he belongs to the class which is prejudiced by the statute."

In 16 C.J.S., Constitutional Law, § 88, p. 179, it is said:

"The unconstitutionality of a statute on the ground that it denies equal rights and privileges by discriminating between persons or classes of persons generally may not be raised by one not belonging to the class allegedly discriminated against."

Neither can the plaintiffs come under any exception to that rule because they can not show any damage on account of that statute. As hereinafter shown the state received for the land more than its appraised value and more than enough to pay the amount due to the trust funds of the State Hospital for the Insane. The state, therefore, suffered no damage. The Carter Oil Company would have a good lease from the state whether the statute was constitutional or not. If the statute were held constitutional then the transaction with Bylin would be valid and the state retained 50 percent of the mineral rights which it

could lease to the Carter Oil Company. If it were held unconstitutional the state owned all of the land and had a right to make the lease to Carter Oil Company. In either event the lease to the Carter Oil Company would be valid. Neither party therefore, has shown any injury to entitle it to question the constitutionality of the Act under which the resale was made.

■ The plaintiffs next claim that the sale to Bylin under Section 15–0715(5), NDRC 1943, violates Section 185 of the constitution of North Dakota, which provides that "neither the state nor any political subdivision thereof shall * * * loan or give its credit or make donations to or in aid of any individual, association or corporation except for reasonable support of the poor * * *." It is claimed that in making the sale to Bylin the state lost money which amounted to a donation to Bylin. The facts do not support that contention. It must be remembered that this repurchase was made by Bylin on September 28, 1944. That was seven years before the discovery of oil in the western part of the state. The real estate values in that part of the state then were low. The property was appraised at $1,800. That appraisal was approved by the Board of University and School Lands. That appraisal must be considered to have been the fair value of the property. There was no evidence that more could have been realized upon a public sale of the property. On the repurchase under Section 15–0715(5) the former owner had to pay the combined amounts of the original unpaid loan which the commissioner found amounted to $1,-915.12, and $21.30 costs of foreclosure, a total of $1,936.43 at the time of foreclosure as required by Section 15–0715(5). Adding interest from that time to the date of the contract the amount necessary to repurchase was found to be $2,055.00. The state, therefore, received all the funds of the Hospital for the Insane that were involved in the loan so that the trust fund was reimbursed in full. The amount so received from Bylin was more than the appraised value of the land. That more could have been realized a year later is no evidence

of a donation to Bylin. It cannot be said, therefore, that this transaction resulted in any donation to Mr. Bylin.

Reference is made to the case of Herr v. Rudolf, 75 N.D. 91, 25 N.W.2d 916, 169 A.L.R. 1388, where it is said that Section 6–0931, NDRC 1943, providing for sales of lands held by the Bank of North Dakota violated Section 185 of the constitution. The facts there, however, were different. The Bank of North Dakota had made a loan to Johan Rudolf, under Chapter 6–09, NDRC 1943, secured by a mortgage which was assigned to the state treasurer as security for North Dakota real estate bonds. Upon the foreclosure of that mortgage the sheriff's deed issued to the state treasurer as trustee. The land thus became an asset in the hands of the state treasurer for the benefit of the real estate bond sinking fund and the real estate bond interest payment fund. Sections 54–3014 and 54–3023, NDRC 1943. There existed at the time a deficiency in those funds. The land was appraised at $2,500. Upon a proposed public sale of the land the plaintiff offered $2,600 and indicated a willingness to bid up to $3,000. Under the challenged statute, Section 6–0931, NDRC 1943, the son of the former owner was entitled to repurchase at private sale for the appraised value, which was at least $100 and, perhaps, as much as $500 less than plaintiff offered. Thus the transaction would have resulted in the loss to the trust funds which the state would have had to make good. This court held that that would have amounted to a donation of such amount to the preferred purchaser as he got that land for that much less than it could have been sold for. Such is not the case here. The land was sold to Bylin for the full amount of the mortgage loan which was more than the appraised value and more than the bid made. There was no loss to the state and no donation to Bylin.

Plaintiffs further contend that the sale to Bylin was invalid in that the loan originally made to Bylin was from the trust fund provided by the Enabling Act for the Hospital for the Insane; that the land obtained on foreclosure of the mortgage se-

curing that loan also became a part of the trust. They refer to sections 11 and 17 of the Enabling Act and sections 205, 215, and 159 of the Constitution of North Dakota. These sections all refer to lands or other property granted directly by the United States or donated to the state for the support of the educational and charitable institutions of the state which are made a permanent trust fund. Such lands can be sold only at a public sale, Sec. 160, Constitution. In support of that contention plaintiffs cited the case of State v. Divide County, 68 N.D. 708, 283 N.W. 184; Murphy v. State, 65 Ariz. 338, 181 P.2d 336; Ervien v. United States, 251 U.S. 41, 40 S.Ct. 75, 64 L.Ed. 128.

The question in the case of State v. Divide County, was the priority of the lien of a mortgage to the state securing a part of the permanent school fund and the lien of taxes against the same land. The statement in the opinion [68 N.D. 708, 283 N.W. 190] that "However, when the mortgage is foreclosed and deed issued to the State, then the land itself becomes part of the permanent school fund of the State" is the statement of only the writer of the opinion and is not the decision of this court.

In Murphy v. State the decision that lands acquired on foreclosure become a part of the trust fund, is based on the provisions of Section 1 of Article 10 of the Arizona constitution, which provides:

"All lands expressly transferred and confirmed to the state by the provisions of the Enabling Act approved June 20, 1910, including all lands granted to the state and all lands heretofore granted to the territory of Arizona, *and all lands otherwise acquired by the state,* shall be by the state accepted and held in trust to be disposed of in whole or in part, only in manner as in the said Enabling Act and in this constitution provided, and for the several objects specified in the respective granting and confirmatory provisions. The natural products and money proceeds of any of said lands shall be subject to the

same trusts as the lands producing the same." (Emphasis supplied.)

It will be noted that this constitutional provision includes not only the lands granted by the United States but also "all lands otherwise acquired by the state". On that and on the repetition of that phrase in Sec. 9, Art. 10, relating to sales of such land, the Arizona court based its decision and held that such lands could be sold only at public sale according to the provisions for the sale of lands granted by the United States.

The Ervien v. United States case merely holds that the permanent trust funds can not be spent in any way inconsistent with the provisons of the constitution for the expenditures of such trust funds and is not authority on the question here in issue.

In the North Dakota Enabling Act there are specific amounts of land granted to the State of North Dakota for schools, higher education and charitable institutions. These lands and funds derived therefrom are made permanent funds for the support of such institutions. These grants were accepted by Section 205 of the constitution on the terms of the grant.

In accordance with the terms of the Enabling Act, Section 159 of the constitution provides for such permanent funds as follows:

"All land, money or other property donated, granted or received from the United States or *any other source for a university, school of mines, reform school, agricultural college, deaf and dumb asylum, normal school or other educational or charitable institution or purpose, and the proceeds of all such lands and other property so received from any source,* shall be and remain perpetual funds, the interest and income of which, together with the rents of all such lands as may remain unsold shall be inviolably appropriated and applied to the specific objects of the original grants or gifts. The principal of every such fund may be increased but

shall never be diminished, and the interest and income only shall be used. Every such fund shall be deemed a trust fund held by the state, and the state shall make good all losses thereof." (Emphasis supplied.)

Such lands can be sold only at public sale, Sec. 11, Enabling Act, Section 160, North Dakota Constitution.

However, the reference in Section 159 of the constitution to property received from "any other source" than the United States clearly indicates that such property must be received for the same purpose as the lands from the United States. It must be definitely granted or donated for the educational or charitable institutions the same as lands granted by the United States. Land received by the state on foreclosure of a mortgage securing a loan from the permanent funds is not received for such purpose but for the payment of the loan. This is well shown by the enactments of the legislature regarding the manner of handling the state lands.

Section 156 of the constitution provides for the establishment of the Board of University and School Lands. To that board was given the control of the appraisement, sale, rental and disposal of school and university lands and the direction of the investment of the funds arising therefrom subject to the provisions of the constitution and any law passed by the legislative assembly in accordance therewith.

Section 15–0201, NDRC 1943, provides for the appointment of a Commissioner of University and School Lands whose acts are subject to the approval of the board.

Section 15–0102, NDRC 1943, gives the board full control over the sale, disposal and management of:

"a * * *; b * * *; c * * *; d. All lands acquired by the state through the investment of the permanent school funds of the state as the result of mortgage foreclosure or otherwise".

Section 15–0601, provides:

"The term 'original grant lands' shall mean all of the public lands which heretofore have been or hereafter may be granted to the state by the United States for the support and maintenance of the common schools or for the support and maintenance of the University, the school of mines, the state training school, the agricultural college, the school for the deaf and dumb, any normal school, or any other educational, penal, or charitable institution, and any lands which have been obtained by the state through a trade of any such lands for other lands. Original grant lands which have been sold on contract shall retain their character as such grant lands until the contract has been paid up and a patent issued therefor."

Chapter 15–06 provides for the sale of original land grants at public sale as provided by sections 158 and 160 of the constitution.

Section 15–0701 reads: "The terms 'other than original grant lands' or 'nongrant lands' shall mean all lands obtained by the board of university and school lands in any manner other than that described in section 15–0601", supra. Nongrant lands may be sold at Private sale under the provisions of Chapter 15–07.

From these provisions of the constitution and statutes it is clear that only the lands or property granted by the United States and property received from any other source for the same purposes as said grant lands constituted the permanent trust fund. Lands acquired by the state upon foreclosure of a mortgage securing a loan made out of such trust funds do not become a part of said permanent trust. Such lands are merely security for the loan. On resale of such lands after foreclosure only the principal of the loan becomes a part of the permanent fund. Section 15–0801, NDRC 1943. They are nongrant lands and may be sold at private sale in accord with Chapter 15–07.

The plaintiffs then raised the question of the validity of the transaction between the

Board of University and School Lands and Ernest Bylin in the repurchase of the land here involved. It is argued that even though the land in question can be sold as nongrant land Mr. Bylin was not entitled to the privilege of repurchase therein granted by Section 15–0715(5) because he was not a farmer residing on the land.

Subsection 5 is the statute here involved which gives the special privilege to the mortgagor or former owner, his widow or one or more of his lineal descendants, who must be a bona fide farmer residing upon the land, to repurchase such land at private sale and at a price not less than the combined amounts of the original, unpaid loan plus costs paid by the state and interest unpaid at the time the state acquired title to such lands, upon the same terms as provided for in public sale except that upon such private sale a cash payment shall be not less than 20 percent of the sale price.

As has been stated the evidence shows that the land involved here was appraised as provided by the law at $1,800 and that the appraisal and sale of the property were approved by the Board of University and School Lands. The amount of the original unpaid loan, the interest and costs paid by the state were all computed and found to amount to $2,055. Bylin was required to pay 20 percent thereof in cash. All the procedural requirements of the statute were strictly followed. The Board of University and School Lands thereupon approved the sale.

In accordance therewith a contract with Bylin was consummated on Sept. 28, 1944. On Oct. 3, 1945, Bylin assigned his contract to Lars Kvam who immediately paid what was due on the contract and received his quitclaim deed from the state on December 8, 1945. Thereafter Kvam sold some mineral acres to defendants, Bylin and Moline and entered into an oil and gas lease with Fruh and Leach and on October 28, 1952, the state, through the Board of University and School Lands entered into an oil and gas lease with the Carter Oil Company, all as heretofore stated.

None of these proceedings were questioned until the beginning of this action on February 18, 1953, an interval of about nine years after the sale of the land by the Board of University and School Lands to Bylin, when the question of his disqualification to claim the privilege under Section 15–0715(5) was raised. There is no evidence of fraud or collusion. The defendants claim the action of the Board of University and School Lands in approving that sale is final and cannot now be questioned by the plaintiffs.

In the case of State v. Oster, N.D., 61 N.W.2d 276, 278, the state in 1916, had sold certain original grant lands to one C. J. Furst who duly assigned his contract to the defendant, Oster. Oster in due time paid the contract in full and received patent conveying fee title to the land. The sale of coal lands is prohibited by the constitution and by statute. For that reason a provision was included in the contract for deed that if the land sold was found to be coal land then it should immediately revert to the state and the contract would become null and void. A reservation covering that was included in the patent. In 1950 the state brought an action to cancel the patent on the grounds that the premises were coal land. The court reviews the steps necessary for the Board of University and School Lands to take before the sale of any lands including the determination of whether any such land was coal land and says:

"All sales are required to be approved by the Board of University and School Lands and no sale shall be approved 'unless, from an examination of the certified lists and other information received and investigation made, it shall appear to the board that the sale was made in accordance with the provisions of this title and without fraud or collusion.' Sec. 15–0805, NDRC 1943, Sec. 174, R.C.1905. After full compliance with all of the terms of his contract, the purchaser shall be issued a patent, 'signed by the governor and attested by the secretary of state with the great seal of the state, and shall be

countersigned by the commissioner of university and school lands with the seal of the board.' Sec. 15–0816, ND RC 1943, Sec. 189, R.C.1905.

"A consideration of the foregoing constitutional and statutory provisions, makes it clear that, while the sales of state lands are surrounded with multiple safeguards to insure against illegal sales, inadequate price and fraud and collusion and to procure an avoidance of contracts of sale for such reasons prior to the issuance of a patent; it was nevertheless the constitutional and legislative intent that after a good faith determination by the board that the sales were not subject to such infirmities, and the issuance of patents to the lands sold, that all questions of legality should be concluded and the sales should be final and irrevocable."

In Syllabus No. 4, the court held:

"The decision reached by the Board of University and School Lands in passing upon the validity of a contract for the sale of school lands, that such lands were not 'coal lands' and therefore legally subject to sale is, in the absence of fraud or other evidence impugning the good faith of the board, final and the title thereafter conveyed by a patent issued to the purchaser of such lands may not be defeated by a subsequent discovery of a coal deposit therein."

In Fuller v. Board of University and School Lands, 21 N.D. 212, 219, 129 N.W. 1029, 1032, this court passed upon the power of the Board of University and School Lands. After reviewing the constitutional and statutory provisions regarding the Board, this court says:

"It has full control of the disposal of public lands under the statute and section 174 of the Revised Code of 1905 [providing that the Board shall pass upon all sales of land] does not in any wise abridge or limit such control or discretion on so important a matter as the very act of final determination as to whether to ratify the sale and thereby pass the matter from its control. In other words, it would be an unreasonable construction of the statute to say that the board has full authority as to the disposal of public lands except as to the most important step in the proceedings, that of determining compliance or noncompliance with the law, adequacy or inadequacy of price, fraud or collusion or absence thereof in the sale, all of them matters regarding which it was the very spirit and object of the Constitution and the law that it should be passed upon by a board whose judgment should be as sound as it should be conclusive. Indeed, the personnel of the board but emphasizes the judgment and discretion presumed to be exercised in the alienating for price of state property, the Constitution providing for the united judgment thereon of a board composed of the Governor, Superintendent of Public Instruction, Attorney General, Secretary of State, and State Auditor. * * *

"Viewed in the light of the reasons for these constitutional and statutory enactments, the importance of the duties conferred upon the board so created the necessity for the exercise of a high degree of judgment and discretion by a tribunal competent to do so and charged with administering as a trustee of the millions in this greatest of all state funds—our school fund—would it not be most absurd to do otherwise than to give full force to the mandate of the Constitution and statute granting full power to this board in the exercise of discretion and judgment in this the most important part of its duties, approval of sales of state property? We must conclude such duty is wholly discretionary, and its decision as a body is a quasi judicial determination."

In the case of State v. Hewitt Land Co., 74 Wash. 573, 134 P. 474, 478, a sale of state lands by the land department was involved. The powers of the land department there are practically the same as the

powers given to our Board of University and School Lands, Section 4 of Article 16 of the Washington constitution prohibits the sale of more than 160 acres of grant lands in one parcel. The sale involved was a tract of 315 acres. The court says:

"The officers of the state have exercised the power vested in them in an irregular way. In exercising their admitted power they have ignored or overlooked the letter of the law; instead of offering the land in two tracts, they have offered and deeded it as one tract. As against the interest of those who have come into the possession and ownership of land so sold, a purchaser for value and without fraud on the part of any one, the state cannot be heard to question its conveyance. 32 Cyc. 1058."

■ In Dickson v. Luck Land Co., 242 U.S. 371, 37 S.Ct. 167, 168, 61 L.Ed. 371, the suit was between two grantees from an Indian patentee who, while a minor, obtained his patent under an act of Congress allowing land to be patented to Indians who had reached their majority. In the course of its decision, the Court makes the following statement:

"There is no mention of his age in the patent, and yet it must be taken as impliedly containing a finding that he was then an adult. This is so, because, every patent for public or Indian lands carries with it an implied affirmation or finding of every fact made a prerequisite to its issue, and because the provision in the act of 1907 made the majority of the allottee a prerequisite to the issue of this patent."

In the case of Standard Oil Co. of California v. United States, 9 Cir., 107 F.2d 402, 410, the United States brought an action to quiet title and for damages. From a decree in favor of the United States the defendants appealed. The question of the authority of the Secretary of the Interior to determine the mineral character of lands arose. The court says:

"The problem, then, as we understand it, is not what authority Congress may confer upon the Secretary, but what authority it has conferred in relation to the administration of this grant. If Congress has clothed the Secretary with general authority to administer the grant, and if his decision of fact in this instance was made within the scope of such authority, there can be no doubt that his decision is conclusive on the courts, in the absence, at any rate, of fraud or imposition." See also Noble v. Union River Logging R. Co., 147 U.S. 165, 13 S.Ct. 271, 37 L.Ed. 123; Vance v. Burbank, 101 U.S. 514, 25 L.Ed. 929; United States v. Southern Pacific R. Co., D.C., 43 F.2d 591.

The matter of the residence of Bylin was before the Board of University and School Lands for decision when they approved the sale to him of the land involved. Even if irregular the courts can not now change that decision.

The plaintiffs' final objection to the sale of this land to Bylin cites Section 15–0806, NDRC 1943, which provides:

"Any sale made by mistake, or not in accordance with law, or obtained by fraud shall be void, and the contract of purchase issued thereon shall be of no effect."

The plaintiffs have expressly denied any implication of actual fraud or collusion but have suggested that insofar as the officials of the department are concerned, their action in negotiating the contract amounted to constructive fraud. This, however, was one of the questions necessarily passed upon by the board and is not subject to review here. In Fuller v. Board of University and School Lands, supra, the court said:

"The board must determine to its own satisfaction that the sale was in accordance with law, and without fraud or collusion, before it can approve such sale. An investigation must be made to determine this, but the amount of investigation and the quality and sources

of information are left for its determination."

█ In accordance with the statutes defining the authority of the Board of University and School Lands, and these authorities, we must conclude that the board in carrying out its duties and in the exercise of its powers found that the sale to Bylin was made according to law. As against those who have since secured an interest in the land in good faith that decision must be held final.

The final question for consideration is whether the state on the sale of the property involved to Bylin was entitled to withhold 50 percent of the gas, oil and mineral rights under Sec. 38–0901, NDRC 1943, which reads:

"In every transfer of land, whether by deed, contract, lease, or otherwise, by the state of North Dakota, or by any department thereof, fifty percent of all oil, natural gas, or minerals which may be found on or underlying such land shall be reserved to the state of North Dakota. Any deed, contract, lease, or other transfer of any such land made after February 20, 1941, which does not contain such reservation shall be construed as if such reservation were contained therein. The provisions of this section shall apply to all lands owned by this state or by any department thereof regardless of how title thereto was acquired."

It is argued that this transaction amounted to a redemption and that, therefore, this statute does not apply and that Bylin recovered his total interest in the land. This, however, is not a redemption but a sale of the property involved. Section 15–0715(5), NDRC 1943, provides that when the former owner or one of the members of the class therein specified make an offer to *repurchase* the lands on the conditions therein described the Board of University and School Lands shall *resell* any of such lands to any such bona fide applicant provided in the law. In the instant case this involves the sale of lands that had been obtained by sheriff's deed upon a foreclosure of a state mortgage.

█ Under a similar statute the right of repurchase by the former owner of lands lost to the county on tax proceedings has been construed by this court as an additional privilege extended to the former owner. In Buman v. Sturn, 73 N.D. 561, 571, 16 N.W. 2d 837, 842, this court said:

"That statute [Chapter 238 S.L.1939] has no connection with or effect upon the vesting of title in the county. It confers an additional right (erroneously designated as a right of redemption) upon the former owner, making him a preferred purchaser without profit to the county. It is a special statute giving him a second chance as a special act of grace." See also Horab v. Williams County, 73 N.D. 754, 759, 19 N.W.2d 649; Stutsman v. Smith, 73 N.D. 664, 675, 18 N.W.2d 639; Coverston v. Grand Forks County, 74 N.D. 552, 23 N.W.2d 746; Blackford v. Judith Basin County, 109 Mont. 578, 98 P.2d 872, 126 A.L.R. 639; Yates v. Hawkins, 46 N.M. 249, 126 P.2d 476.

In Ulrich v. Amerada Petroleum Corporation, N.D., 66 N.W.2d 397, 404, we say:

"This court has repeatedly held that these provisions for * * * repurchase of property by the former owner are merely an additional privilege extended to the former owner. He is not thereby granted any vested interest in the property."

As the facts in the case at bar show the time for redemption had long expired. The state owned the land by virtue of a sheriff's deed. Section 28–2414, NDRC 1943, provides that a sheriff's deed "shall vest in the grantee as good and perfect a title in the premises therein mentioned and described as was vested in the debtor at or after the time when such real property became liable to the satisfaction of the judgment." In State ex rel. Forest Lake State Bank v. Herman, 36 N.D. 177, 161 N.W. 1017, this court held that "upon the expiration of the period for redemption the full beneficial ownership of the debtor passes to the purchaser at the execution sale * * *." In Nichols v. Tingstad, 10 N.D. 172, 86 N.W. 694, this

court held that "A sheriff's deed to a purchaser under a valid foreclosure and sale conveys to such purchaser all the right, title, and interest which the mortgagor had in such lands at the date of the execution and delivery of such mortgage * * *." See also the North Dakota Horse & Cattle Co. v. Serumgard, 17 N.D. 466, 117 N.W. 453, 29 L.R.A.,N.S., 508.

The abstract in evidence shows that Bylin had clear title to this land when the mortgage was given. It is clear that Bylin lost all his right, title and interest to the land when the time of redemption expired and that the sheriff's deed obtained thereafter vested the state with his complete title to the premises here involved.

Section 15-0715(5) provides that "the board of university and school lands shall resell any of such lands to any such bona fide applicant * * *." There is no provision such as there is in Sec. 57-2819, NDRC 1943 giving the prior owner the right to re-purchase "all real estate" which he forfeited to the county. The right to purchase all interest in the property is not included in the privilege granted by Sec. 15-0715(5). When the state obtained title under Section 15-0715(5) it was an absolute title including all interest in the land and which it could sell on its own conditions.

"The State, of course, may own and hold property. Unless prohibited by some constitutional provision it may dispose of it just as any citizen may dispose of his property." Herr v. Rudolf, 75 N.D. 91, 99, 25 N.W.2d 916, 919, 169 A.L.R. 1388.

"'The proprietary rights of a state are as absolute and unqualified as those of an individual. It may, in the absence of any self-imposed restrictions in its constitution, sell and dispose of its property upon its own terms and conditions * * *.'" State ex rel. Equity Farms v. Hubbard, 203 Minn. 111, 280 N.W. 9, 12.

The legislature by the enactment of Section 38-0901, supra, laid down as a condition on all transfers of state land that 50 percent of the oil, natural gas and minerals therein be reserved in the state.

That this was the intention of the legislature is borne out by its subsequent action. In 1951 the legislature enacted Chapter 231 S.L.1951, providing that thereafter any lands sold by the state or any of its departments to the former owner, his spouse, or lineal descendants in the first degree "shall be sold free of any reservation of minerals provided for in section 38-0901 of the North Dakota Revised Code of 1943 or in chapter 149 of the 1939 session laws." That shows the original intention of the legislature to retain the 50 percent of the minerals in such cases up to that time.

It was further provided in Sec. 2 of that chapter that when the state or any of its departments had "subsequent to March 12, 1939, sold lands to any person from whom the state derived title to such lands, or to his spouse or to his lineal descendants in the first degree, and such purchaser or his spouse or his lineal descendants in the first degree are the owners of such lands at the date of the passage of this Act, the state and its departments shall release to such person any reservation of minerals made under section 38-0901 of the North Dakota Revised Code of 1943, or under chapter 149 of the 1939 session laws." While this last section has been declared unconstitutional by this court in Solberg v. State Treasurer, 78 N.D. 806, 53 N.W.2d 49, it still shows the legislative interpretation of Sec. 38-0901, supra, to the effect that by said section the legislature had reserved in the state 50 percent of the oil, gas and minerals in all state lands sold by the state or its departments and that said reservation was still in existence. Otherwise there would have been no need for a legislative release thereof. The sale to Bylin was made in 1944. Clearly the state had a right to reserve 50 percent of the oil, gas and minerals in and under the land sold by the state to Bylin.

This action of the legislature also answers the claim of the Amerada Petroleum Corporation that because there is no reservation of oil rights in Section 15-0715(5), supra, enacted in 1943, that amounts to an implied repeal of Section 38-0901, supra, en-

acted in 1941. That no such repeal was intended is shown by the acts of the legislature in 1951, Chapter 231, supra, making further disposition of the oil rights retained under Section 38-0901, supra. There was no conflict in regard to those two sections. There is no relation between them.

We have come to the conclusion that the plaintiffs have not shown any right to question the constitutionality of Section 15-0715 (5), supra; that no damage has been shown by the plaintiffs; that the repurchase of that land by Bylin under that statute must be held valid; that the state had a right to reserve 50 percent of the oil, gas and minerals and that the other 50 percent was included in the transfer to Kvam. It follows that the lease by the state of 50 percent of the oil, gas and minerals to the plaintiff, Carter Oil Company, is valid, and that Kvam had a right to lease the other 50 percent as well as to convey mineral rights to Bylin and Moline.

The judgment of the district court is modified and the case is remanded for entry of judgment in accordance herewith.

BURKE, C. J., and JOHNSON, SATHRE and MORRIS, JJ., concur.