[File No. 7112]

OZARK-MAHONING COMPANY, a foreign corporation of Tulsa, Oklahoma, Respondent, v. STATE OF NORTH DAKOTA, Appellant.

(37 NW2d 488)

Opinion filed April 26, 1949

*Nels G. Johnson,* Attorney General, *P. O. Sathre* and *C. E. Brace,* Assistant Attorneys General, for appellant.

*Sullivan, Fleck, Kelsch & Lord,* and *Williams, Boesche & Mc-Dermott,* for respondent.

NUESSLE, Ch. J. This is a statutory action, see Chapter 32, Rev Code ND 1943, to quiet title to the bed of Grenora Lake No. 2, hereinafter referred to as Grenora Lake. The case was tried to the court. The court found for the plaintiff. Judgment was entered accordingly whereupon the State, the defendant herein, perfected the instant appeal and demands a trial de novo.

Grenora Lake is one of a chain of lakes in Divide County in the northwestern corner of North Dakota. These lakes lie along a depression that probably was a part of the pre-glacial valley of either the Missouri River or the Yellowstone River when those streams emptied into Hudson Bay. The lake is of irregular shape with an area of a little more than a square mile. Its waters are malodorous and are unfit for use by man, beast, fish or fowl, though aquatic birds sometimes rest on its surface. Its bed is level and consists of a permanent solid body of sodium sulphate varying in thickness from two to eighty feet with an average thickness of twelve feet and containing an estimated eleven million tons of sodium sulphate. The lake is nearly surrounded by a quagmiry mud flat of a character such as to make access to it difficult. No vegetation grows in it nor are there any trees or brush around it. It lies in a little valley or pocket wholly surrounded by hills and has neither inlet nor outlet. Its waters are derived from precipitation, from run-off from the hills and from numerous springs flowing from its bed as well as out of the mud flat. The water, as it flows from some of these springs, is clear and potable but that from others is somewhat impregnated with sodium sulphate. Ordinarily evaporation is greater than the sum of the waters from the various sources above mentioned. Through the course of thousands of years the mineral content of the spring-water has been deposited thus forming the bed of sodium sulphate. In the spring of the year when the run-off is heavy or when there is exceptional precipitation the water level may reach a height of as much as a foot or two above the bed of the lake. In times of drouth or late in the summer season the surface water is greatly diminished

so that there are only occasional pools here and there, while other parts of the lake are covered with a slushy saturated solution of sodium sulphate and mud, varying from an inch to a foot in depth.

North Dakota was admitted to the Union as a state in 1889. At that time the public domain in the northwestern part of North Dakota had not been surveyed. That portion thereof wherein Grenora Lake lies was surveyed in June 1898 and this survey was approved by the Surveyor General in 1899. The lake was meandered. The fractional portions of the surrounding sections (Section 4, Township 159, 103, and Sections 28, 29, 32, 33, and 34, Township 160, 103) created by the meander lines were designated as lots and numbered in the manner usually followed by surveyors in such cases. Thereafter these lots were patented and ultimately the plaintiff purchased them from the patentees or their grantees, acquiring all but two. The patents contained no mineral or other reservations or restrictions. As owner of the lots plaintiff, as a riparian owner, now claims title to practically all of the bed of the lake. The state on the other hand denies this claim and asserts ownership in itself on the ground that the lake was navigable when North Dakota was admitted to the Union, when the survey by the government was made, and when the patents through which the plaintiff derives its title were issued.

There are many cases in the books dealing with the questions the answers to which are vital to the determination of the instant case. The case of United States v. Oregon, 295 US 1, 79 L ed 1267, 55 S Ct 610, decided April 1, 1935, in an exhaustive opinion states the rules which determine many of the questions here involved. In that case the court said that,

"Upon the admission of a state to the Union, the title of the United States to lands underlying navigable waters within the state passes to it, as incident to the transfer to the state of local sovereignty, and is subject only to the paramount power of the United States to control such waters for purposes of navigation in interstate and foreign commerce."

Consistent with what is there said we have held to the same effect. See Roberts v. Taylor, 47 ND 146, 181 NW 622; State

v. Loy, 74 ND 182, 22 NW2d 668; State v. Brace, 76 ND 314, 36 NW2d 330 and cases cited. The Oregon case further holds that if waters in a state are not navigable in fact at the time of its creation the title of the United States to lands underlying them remains unaffected and whether such waters are navigable is a federal question to be determined according to the law and usage recognized in the federal courts.

We have heretofore stated the salient facts established by the record respecting Grenora Lake at the present time. There is nothing in the record to indicate that there is any particular difference between the general character and condition of the lake now and its character and condition when the state was admitted into the Union or at the time when the survey was made in 1898 and the meander lines about it were run by the surveyors. The lake has neither inlet nor outlet. Its bed is solid and practically level throughout its whole extent. The annual increment to the deposit of the mineral in its bed must have been insignificant throughout the centuries. It cannot be believed that the thickness of the sodium sulphate deposit has increased to any appreciable extent during the time since the state was admitted into the Union. There is no evidence that any use ever has been or could be made of the waters of the lake either for pleasure or for profit, for travel, or for trade. No boats were used thereon. The water at all times has been of such a character that it was not habitable for fish. Neither the lake nor its surroundings are suitable for any purposes of pleasure. It is true that aquatic birds sometimes rested on its surface and there is evidence that hunters occasionally shot waterfowl that flew to or from the lake, but this was an infrequent occurrence. On these facts, measured by the federal rule as to navigability it is certain that the lake was not navigable in fact at the time of the admission of the state into the Union or at the time the lands abutting on its meander lines were patented. See United States v. Oregon (US) supra, and the numerous authorities cited therein. Accordingly the title to the land under the waters of Lake Grenora did not pass to the State of North Dakota when it was admitted into the Union, but remained in the United States subject to such disposition

as the latter might see fit to make of it. And while the test as to navigability applied in North Dakota is not as narrow as that in the federal courts, nevertheless, considering the record in the light of the tests determining navigability heretofore adopted and applied by our own court, we can come to no other conclusion than that the lake is not now and was not navigable either at the time North Dakota was admitted into the Union or at the time when the land surrounding the lake was patented by the United States. See Brignall v. Hannah, 34 ND 174, 157 NW 1042; Roberts v. Taylor, 47 ND 146, 181 NW 622, supra; State v. Brace, 76 ND 314, 36 NW2d 330, supra.

The area in which Grenora Lake lies was not surveyed until some ten years after North Dakota attained statehood. The lands the plaintiff now owns and on which it predicates its claim of ownership of the lake bed were not patented until some years thereafter. The patents contained no reservations or restrictions. What then was the effect of the grants therein?

"The laws of the United States alone control the disposition of title to its lands. The states are powerless to place any limitation or restriction on that control. The construction of grants by the United States is a Federal not a state question." United States v. Oregon, 295 US 1, 79 L ed 1267, 55 S Ct 610, supra and cases cited therein.

But, "Where the United States owns the bed of a non-navigable stream and the upland on one or both sides, it, of course, is free, when disposing of the upland, to retain all or any part of the river bed; and whether, in any particular instance, it has done so, is essentially a question of what it intended. If by a treaty or statute or the terms of its patent it has shown that it intended to restrict the conveyance to the upland, or to that and a part only of the river bed, that intention will be controlling; and, if its intention be not otherwise shown, it will be taken to have assented that its conveyance should be construed and given effect in this particular according to the law of the state in which the land lies." Oklahoma v. Texas, 258 US 574, 66 L ed 771, 42 S Ct 406.

See also United States v. Oregon (US) supra; Hardin v. Jor-

dan, 140 US 371, 35 L ed 428, 11 S Ct 808, 838. Accordingly and consistent with the cases just above cited, we have stated and applied the rule that where public land bounded by non-navigable waters is patented by the United States without reservation or restriction, the conveyance will be construed and given effect according to the law of the state of North Dakota. See Brignall v. Hannah, 34 ND 174, 157 NW 1042, supra; Roberts v. Taylor, 47 ND 146, 181 NW 622, supra; State v. Brace, 76 ND 314, 36 NW2d 330, supra, and cases cited.

Plaintiff owns practically all of the lots abutting on the meander lines around the lake. It claims title to the bed of the lake by virtue of the riparian rights incident to such ownership. Meander lines are not per se boundary lines. They are lines run along the margin of a body of water to ascertain the quantity of upland to be charged for when sold and not to limit the title of the grantee to the meander lines. The waters themselves constitute the real boundaries of the lands abutting on such meander lines. And the patents convey, in case the waters are not navigable, the title of the land lying thereunder to their center. Boundary lines of these lands are fixed by extending from each end of their respective meander lines, lines converging to a point in the center of the waters. See Brignall v. Hannah, 34 ND 174, 157 NW 1042, supra; State v. Brace (ND) supra; Oberly v. Carpenter, 67 ND 495, 274 NW 509; see also Hardin v. Jordan, 140 US 371, 35 L ed 428, 11 S Ct 808, 838, supra; United States v. Otley (CA9th Or) 127 F2d 988. Holding as we do that Grenora Lake was not navigable when the plaintiff's lots were granted to the patentees, it necessarily follows that pursuant to the cases just above cited plaintiff is entitled to have judgment in accordance with the prayer of its complaint, unless it appears that some reason exists why the precedents thus established have no application in the instant case.

The defendant, however, contends that the test of navigability applied in the cases cited has been abrogated by statutory enactment and in that behalf it cites and relies upon § 61–1501, subdivision 2, Rev Code ND 1943, providing

" 'A navigable lake' shall include any lake which shall have

been meandered and its metes and bounds established by the government of the United States in the survey of public lands." and § 61–1502, providing,

"By virtue of its police power the state shall be vested with the control of navigable lakes which have been meandered and their metes and bounds established by the government of the United States in the survey of public lands, within the ordinary high watermark, for the purpose of constructing, maintaining, and operating dams, dikes, ditches, fills, spillways, or other structures to promote the conservation, development, storage, distribution, and utilization of such water and the propagation and preservation of wildlife."

The rights of the grantees under the patents issued by the United States government were fixed and vested as of the dates of those patents. The riparian rights that the grantees thus acquired were valuable property rights. The state cannot constitutionally divest the owners thereof and transfer the property to itself without the payment of due compensation under the exercise of the powers of eminent domain. See Bigelow v. Draper, 6 ND 152, 69 NW 570. And as we said of the statutes above quoted in State v. Brace, 76 ND 314, 36 NW2d 330, supra,

"These statutes came into our law in substantially their present form as a part of Chapter 229, SL ND 1935. They do not purport to vest title to property in the state. Obviously they could not divest owners of their lands and transfer property to the state without the payment of due compensation under the exercise of the powers of eminent domain.

"We are here dealing with titles vested by patents from the United States. Such titles cannot be affected by the declaration of navigability contained in Section 61–1501, Rev Code ND 1943. The legislature may not adopt a retroactive definition of navigability which would destroy a title already vested under a federal grant, or transfer to the state a property right in a body of water or the bed thereof that had been previously acquired by a private owner. United States v. Champlin Refining Co., 10 Cir, 156 F2d 769. A legislative declaration that all meandered lakes are navigable will not make them so if they are not navi-

gable in fact, as against the pre-existing rights of riparian owners, unless compensation is made to such owners for the property thus injured or taken by the state. 56 Am Juris, Waters, Sec 185."

Finally, the State contends that the sodium sulphate bed of the lake is a mineral body and asserts its claim thereto by virtue of § 210 of the Constitution of North Dakota providing that,

"All flowing streams and natural water courses shall forever remain the property of the state for mining, irrigating and manufacturing purposes." We do not believe that such effect can be given to this constitutional provision. It has application only to the waters of flowing streams and natural water courses and not to lands underlying non-navigable streams and water courses. We can see no distinction that can possibly be drawn between a lake bed that consists of sodium sulphate and one that consists of rock, or sand, or ordinary soil. The grant from the United States was without reservation. It conveyed the land under the lake since the lake was non-navigable. In Bigelow v. Draper (ND) supra, this court, considering the effect of § 210 of the Constitution quoted above, said,

"At common law, the owner of land through which a non-navigable stream flowed was possessed of the title to the bed of the stream, as well as the right to a reasonable use of the water. The land under the water was his. . . . These doctrines of the common law were in force in the Territory of Dakota at the time of the adoption of the constitution of this state. By virtue of them, the riparian owners in the territory were vested with the specified property rights in the bed of all natural water courses, and in the water itself. · Such rights were under the protection of the fourteenth amendment to the federal constitution, which protects property against all state action that does not constitute due process of law. It follows that Section 210 of the state constitution would itself be unconstitutional in so far as it attempted to destroy those vested rights of property, if it should by construction be given a scope sufficiently wide to embrace such matters. For this reason, we feel constrained to hold, despite its broad language, that Section 210 was not

framed to divest the rights of riparian owners in the waters and bed of all natural water courses in the state."

The judgment is affirmed.

BURKE, MORRIS and CHRISTIANSON, JJ., and GRIMSON, District J., concur.

BURR, J., did not participate.