**Corrected Opinion Filed 8/17/20 by Clerk of the Supreme Court**

**Substitute Opinion Page 2, Paragraph 4 and Page 3 filed 08/04/2020**

**Filed 07/30/20 by Clerk of Supreme Court**

# IN THE SUPREME COURT
# STATE OF NORTH DAKOTA

2020 ND 175

Paul Sorum, Marvin Nelson, Michael Coachman,
Charles Tuttle and Lisa Marie Omlid, each on
behalf of themselves and all similarly situated
tax payers of the State of North Dakota,

               Plaintiffs, Appellees,
               and Cross-Appellants

      v.

The State of North Dakota, The Board of University
and School Lands of the State of North Dakota,
The North Dakota Industrial Commission,
The Hon. Douglas Burgum, in his official capacity
as Governor of the State of North Dakota, and the
Hon. Wayne Stenehjem, in his official capacity as
Attorney General of North Dakota,

               Defendants, Appellants,
               and Cross-Appellees

No. 20190203

Appeal from the District Court of Cass County, East Central Judicial District,
the Honorable John C. Irby, Judge.

AFFIRMED IN PART AND REVERSED IN PART.

Opinion of the Court by Tufte, Justice, in which Chief Justice Jensen, Justice
VandeWalle, and Surrogate Judge Anderson joined. Justice Crothers filed a
specially concurring opinion, in which Chief Justice Jensen joined.

Terrance W. Moore (argued), J. Robert Keena (appeared), and Joseph M.
Barnett (on brief), Edina, Minnesota, for plaintiffs, appellees, and cross-
appellants Marvin Nelson, Michael Coachman, Charles Tuttle, and Lisa Marie
Omlid.

**Corrected Opinion Filed 8/17/20 by Clerk of the Supreme Court**

Paul J. Sorum (appeared), self-represented, Bismarck, North Dakota, plaintiff, appellee, and cross-appellant.

Matthew A. Sagsveen (appeared), Solicitor General, Office of Attorney General, Bismarck, North Dakota, for defendants, appellants, and cross-appellees the State of North Dakota, the Hon. Douglas Burgum, and the Hon. Wayne Stenehjem.

Daniel L. Gaustad (argued), Ronald F. Fischer (on brief), and Joseph E. Quinn (on brief), Special Assistant Attorneys General, Grand Forks, North Dakota, for defendant, appellant, and cross-appellee North Dakota Industrial Commission.

Mark R. Hanson (appeared), Special Assistant Attorney General, Fargo, North Dakota, for defendant, appellant, and cross-appellee Board of University and School Lands of the State of North Dakota.

Craig C. Smith (on brief) and Paul J. Forster (on brief), Bismarck, North Dakota, for amicus curiae North Dakota Petroleum Council.

**Sorum v. State**
No. 20190203

**Tufte, Justice.**

[¶1]   The Plaintiffs, in their individual capacities and on behalf of similarly situated taxpayers, commenced this action for a declaratory judgment that chapter 61-33.1, N.D.C.C., relating to the ownership of mineral rights in lands subject to inundation by the Garrison Dam, is unconstitutional. The district court concluded that N.D.C.C. § 61-33.1-04(1)(b) is on its face unconstitutional under the "gift clause," N.D. Const. art. X, § 18, and enjoined the State from issuing any payments under that statute. The court rejected Plaintiffs' constitutional challenges to the rest of chapter 61-33.1. The Defendants appeal and the Plaintiffs cross-appeal from the court's orders, judgment, and amended judgment. We reverse that portion of the judgment concluding N.D.C.C. § 61-33.1-04(1)(b) violates the gift clause and the court's injunction enjoining those payments. We also reverse the court's award of attorney's fees and costs and service award to the Plaintiffs because they are no longer prevailing parties. We affirm the remainder of the orders and judgment, concluding the Plaintiffs have not established that chapter 61-33.1 on its face violates the constitution.

I

[¶2]   In 1944, the United States Congress authorized the construction of the Garrison Dam on the Missouri River. Closure of the Garrison Dam resulted in the impoundment of water in a reservoir now known as Lake Sakakawea. Before construction began, the Army Corps of Engineers surveyed the area to be inundated by the reservoir. The Corps used the survey to determine the acreage necessary to be taken for the Garrison Dam project. The Corps acquired through purchase or condemnation land that now makes up the bed of Lake Sakakawea.

[¶3]   In 1951, oil was first discovered in the Bakken Formation, some of which lies under present-day Lake Sakakawea. Some owners of land in the Garrison Dam take area reserved their mineral interests when they conveyed land title to the United States. Beginning around 2006, horizontal drilling and hydraulic

fracturing made oil and gas underneath the bed of Lake Sakakawea economically accessible to producers.

[¶4]   The Board of University and School Lands ("the Land Board") manages the state's sovereign lands related oil and gas interests. The State Engineer manages all other state-owned minerals. In 2008, the Land Board authorized a "Phase 1" survey to determine the ordinary high water mark ("OHWM") of the Yellowstone and Missouri Rivers west of the Highway 85 Bridge. In 2010, the Land Board authorized the "Phase 2" survey of the historical OHWM of the Missouri River from Trenton to the Fort Berthold Reservation as it existed prior to closure of the Garrison Dam. The Land Board used the Phase 2 survey results for leasing sovereign minerals east of the Highway 85 Bridge.

[¶5]   The Phase 2 report contained the caveat that "[t]he work completed under this contract was to investigate and identify the OHWM using historic data, and is not a final legal determination as to whether any specific property is 'sovereign land.'" In anticipation of title disputes, the Land Board also established escrow accounts for disputed funds.

[¶6]   In 2017, the Legislative Assembly enacted Senate Bill 2134, which is now codified as N.D.C.C. ch. 61-33.1 ("the Act"). The Act sought to define and limit claims of state ownership of the minerals underneath Lake Sakakawea. Section 61-33.1-02, N.D.C.C., states:

> The state sovereign land mineral ownership of the riverbed segments subject to inundation by Pick-Sloan Missouri basin project dams extends only to the historical Missouri riverbed channel up to the ordinary high water mark. The state holds no claim or title to any minerals above the ordinary high water mark of the historical Missouri riverbed channel subject to inundation by Pick-Sloan Missouri basin project dams, except for original grant lands acquired by the state under federal law and any minerals acquired by the state through purchase, foreclosure, or other written conveyance. Mineral ownership of the riverbed segments subject to inundation by Pick-Sloan Missouri basin project dams which are located within the exterior boundaries of the Fort Berthold reservation and Standing Rock Indian

2

reservation is controlled by other law and is excepted from this section.

[¶7] Under the Act, the Corps Survey acted as the presumptive historical OHWM of the Missouri River. N.D.C.C. § 61-33.1-03(1). The Act directed the department of mineral resources to hire an engineering firm to review the corps survey. N.D.C.C. § 61-33.1-03(2). Wenck Associates, Inc., completed a survey, and its results were adopted as the true historical OHWM of the Missouri River.

[¶8] The Act also provided that within six months after the Land Board adopted the acreage determination, "[a]ny royalty proceeds held by operators attributable to oil and gas mineral tracts lying entirely above the ordinary high water mark of the historical Missouri riverbed channel on both the corps survey and the state phase two survey must be released to the owners of the tracts, absent a showing of other defects affecting mineral title." N.D.C.C. § 61-33.1-04(1)(a). The Act is retroactive and applies to oil and gas wells spud after January 1, 2006, for purposes of oil and gas mineral and royalty ownership. *Id*; 2017 N.D. Sess. Laws ch. 426, § 4. The Legislative Assembly appropriated $100 million for these refunds, and authorized an $87 million line of credit with the Bank of North Dakota if the initial appropriation was insufficient. 2017 N.D. Sess. Laws ch. 426, § 3.

[¶9] In January 2018, the Plaintiffs sued the Defendants, seeking a declaratory judgment that the Act is unconstitutional, and to enjoin the Defendants from enforcing it. The Plaintiffs' complaint alleged N.D.C.C. ch. 61-33.1 "unconstitutionally gives away State-owned mineral interests to 108,000 acres underneath the OHWM of the Missouri River/Lake Sakakawea, and above the Historic OHWM and gives away over $205 million in payments, in violation of the Constitution of the State of North Dakota." The Plaintiffs sought "a declaration that 61-33.1 is unconstitutional and an injunction prohibiting all State officials from further implementing and enforcing the Act."

[¶10] The Defendants moved to dismiss under N.D.R.Civ.P. 19(b). The Defendants argued the Plaintiffs' failure to join all parties with leaseholds and other interests in the minerals affected by the lawsuit required dismissal. The district court denied the Defendants' motion, concluding the Plaintiffs did not fail to join any necessary party.

[¶11] The Plaintiffs moved to preliminarily enjoin the Defendants from enforcing the Act. The district court concluded the Plaintiffs were unlikely to prevail on any of their claims except that payments authorized under N.D.C.C. § 61-33.1-04(1)(b) violated the gift clause of the North Dakota Constitution. The district court granted a partial preliminary injunction preventing the Defendants from releasing refund payments under N.D.C.C. § 61-33.1-04(1)(b).

[¶12] The parties submitted opposing motions for summary judgment premised on material facts stipulated for purposes of the motions. With one exception, the district court rejected the constitutional challenges to N.D.C.C. ch. 61-33.1 and granted summary judgment in favor of the Defendants. The court concluded the authorization for payment of refunds under N.D.C.C. § 61-33.1-04(1)(b) on its face violates the gift clause, N.D. Const. art. X, § 18, and enjoined the Defendants from paying the refunds.

[¶13] The Plaintiffs moved for an award of attorney's fees, costs, and service awards. The Plaintiffs asked for $62,271,000 in attorney's fees under the common fund and private attorney general doctrines. The Plaintiffs' attorneys submitted affidavits indicating the number of hours billed and hourly rates of the attorneys totaling $2,428,111 and $138,914.96. The district court concluded there was no common fund and the Plaintiffs' lodestars were excessive, but it awarded $723,200 and $43,800 in attorney's fees to the Plaintiffs under the private attorney general doctrine. It also awarded $18,145.20 in costs. The court awarded a service award to the named Plaintiffs in the amount of $5,000 plus $50 per hour dedicated to the case by each Plaintiff. The court did not cite legal authority for the award, but instead cited Quaker Oats pitchman Wilford Brimley, stating "it's the right thing to do."

4

II

[¶14] The Defendants argue the district court abused its discretion in denying their motion to dismiss for failure to join an indispensable party under N.D.R.Civ.P. 19(b). We review a district court's decision on a motion to dismiss for failure to join an indispensable party for an abuse of discretion. *Statoil Oil & Gas LP v. Abaco Energy, LLC*, 2017 ND 148, ¶ 6, 897 N.W.2d 1. A court abuses its discretion only when "it acts in an arbitrary, unreasonable, or unconscionable manner, its decision is not the product of a rational mental process leading to a reasoned decision, or if it misinterprets or misapplies the law." *Id.* at ¶ 14 (quoting *Datz v. Dosch*, 2014 ND 102, ¶ 22, 846 N.W.2d 724).

[¶15] Rule 19(a), N.D.R.Civ.P., provides for the joinder of persons needed for just adjudication. *Stonewood Hotel Corp. v. Davis Dev., Inc.*, 447 N.W.2d 286, 289 (N.D. 1989). Under N.D.R.Civ.P. 19(a), a required party is one who "in that person's absence, the court cannot accord complete relief among existing parties" or one who holds "an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may . . . as a practical matter impair or impede the person's ability to protect the interest; or . . . leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest."

[¶16] Rule 19(b), N.D.R.Civ.P., provides for dismissal of an action in which a required party cannot be made a party and is indispensable. "Dismissal of an action for non-joinder of a party is an extreme remedy which should only be granted where a party is truly 'indispensable.'" *Kouba v. Great Plains Pelleting, Inc.*, 372 N.W.2d 884, 887 (N.D. 1985).

[¶17] "Complete relief" enjoining any enforcement of N.D.C.C. ch. 61-33.1 can be accorded without joinder of leaseholders or other interest holders in this action. The Defendants argue the court erred because proceeding in the action without joining leaseholders and other interest holders would risk incurring double, multiple, or otherwise inconsistent obligations for those individuals. It is well-settled that joinder of all affected parties is not required where the plaintiff seeks to vindicate a public right. *See National Licorice Co. v. NLRB*,

309 U.S. 350, 362-63 (1940). Here, the action is a taxpayer challenge to the constitutionality of a statute. Taxpayer challenges differ from most civil cases in that a private party seeks to vindicate not only the party's own individual rights, but the rights of the public at large. Because the Plaintiffs here are seeking to enforce public rights, they were not required to join every affected party. The district court did not act in an arbitrary, unreasonable, or unconscionable manner, or misinterpret or misapply the law. Therefore, we hold the district court did not abuse its discretion in denying the Defendants' Rule 19 motion to dismiss, and affirm the order denying the motion.

III

[¶18] In their complaint, the Plaintiffs sought a declaration that N.D.C.C. ch. 61-33.1 is unconstitutional under the North Dakota Constitution's gift clause, watercourses clause, privileges or immunities clause, and the local or special laws prohibition. The Plaintiffs also argued the Act violates the public trust doctrine and sought declaratory relief and an injunction prohibiting all state officials from implementing or enforcing the Act. The district court rejected these challenges to the Act, with the exception of N.D.C.C. § 61-33.1-04(1)(b), which the court concluded was facially unconstitutional under the gift clause.

[¶19] "Whether a statute is unconstitutional is a question of law, which is fully reviewable on appeal." *Teigen v. State*, 2008 ND 88, ¶ 7, 749 N.W.2d 505 (citing *Best Products Co., Inc. v. Spaeth,* 461 N.W.2d 91, 96 (N.D. 1990)). When interpreting constitutional provisions, "we apply general principles of statutory construction." *State ex rel. Heitkamp v. Hagerty*, 1998 ND 122, ¶ 13, 580 N.W.2d 139 (quoting *Comm'n on Med. Competency v. Racek*, 527 N.W.2d 262, 266 (N.D. 1995). We aim to give effect to the intent and purpose of the people who adopted the constitutional provision. *Id*. We determine the intent and purpose of a constitutional provision, "if possible, from the language itself." *Kelsh v. Jaeger*, 2002 ND 53, ¶ 7, 641 N.W.2d 100. "In interpreting clauses in a constitution we must presume that words have been employed in their natural and ordinary meaning." *Cardiff v. Bismarck Pub. Sch. Dist.*, 263 N.W.2d 105, 107 (N.D. 1978).

[¶20] "A constitution 'must be construed in the light of contemporaneous history—of conditions existing at and prior to its adoption. By no other mode of construction can the intent of its framers be determined and their purpose given force and effect.'" *Hagerty*, 1998 ND 122, ¶ 17, 580 N.W.2d 139 (quoting *Ex parte Corliss*, 16 N.D. 470, 481, 114 N.W. 962, 967 (1907)). Ultimately, our duty is to "reconcile statutes with the constitution when that can be done without doing violence to the language of either." *State ex rel. Rausch v. Amerada Petroleum Corp.*, 78 N.D. 247, 256, 49 N.W.2d 14, 20 (1951). Under N.D. Const. art. VI, § 4, we "shall not declare a legislative enactment unconstitutional unless at least four of the members of the court so decide."

[¶21] The Plaintiffs' constitutional challenges are "facial" challenges rather than "as-applied" challenges. Rather than challenging a particular refund under a particular lease as a constitutional violation by the state officer executing the law, the complaint sought "a declaration that [N.D.C.C. ch.] 61-33.1 is unconstitutional." A claim that a statute on its face violates the constitution is a claim that the Legislative Assembly exceeded a constitutional limitation in enacting it, and the practical result of a judgment declaring a statute unconstitutional is to treat it "as if it never were enacted." *Hoff v. Berg*, 1999 ND 115, ¶ 19, 595 N.W.2d 285. The Plaintiffs' assertion of standing as taxpayers underscores this. The Plaintiffs assert no personal interest or ownership in the minerals at issue—as taxpayers, they claim only financial harm to the government and seek a declaration that the Act is void and no payments may be made under its authority. A facial challenge to a statute presents a higher bar than an as-applied challenge because under N.D. Const. art. VI, § 4, it requires four votes in this court to declare a legislative enactment unconstitutional. A facial challenge is purely a question of law because the violation, if any, occurs at the point of enactment by virtue of the Legislative Assembly enacting a law prohibited by the constitution. *Id.* A violation that occurs at the time of enactment does not depend on any facts or circumstances arising later.

A

[¶22] The Defendants argue that because the Plaintiffs' claims are limited to facial challenges, their burden is to establish there is no set of circumstances under which chapter 61-33.1 could constitutionally be applied. As presented here, the Defendants argue the Plaintiffs must establish that the State owns the entire affected area because the Act could constitutionally be applied to any lands the State does not own. Likewise, N.D.C.C. § 61-33.1-04(1)(b) applies to claims for return of royalties within the statute of limitations and to claims that have lapsed. The Defendants cite to our recent application of a "no set of circumstances" standard to an individual's facial equal protection challenge. *Larimore Pub. Sch. Dist. No. 44 v. Aamodt*, 2018 ND 71, ¶ 38, 908 N.W.2d 442 (citing *U.S. v. Salerno*, 481 U.S. 739, 745 (1987)). The Defendants' assertion that they can defeat all of these facial challenges at the outset by hypothesizing a constitutional application is unpersuasive and inconsistent with how we have analyzed facial challenges brought by taxpayers seeking to invalidate spending statutes under the constitution's gift clause and debt limit provisions.

[¶23] The Plaintiffs argue the State may not legitimate an unconstitutional gift by pairing it with transfers that do not violate the gift clause. If the State owns some of the mineral acres in the affected area, it may not by statute renounce all interest in all the acres and respond to a gift clause challenge by asserting the statute is facially constitutional because it has constitutional application to the renounced acreage the State didn't own to begin with. We apply our longstanding standard for taxpayer challenges to statutes under the gift clause. A taxpayer's burden in a facial challenge under the gift clause is satisfied if the statute requires some transfers that would be unconstitutional donations regardless of whether other transfers under the statute would not constitute unconstitutional donations. *State ex rel. Eckroth v. Borge*, 69 N.D. 1, 12, 283 N.W. 521, 526 (1939) (reasoning that if statute removed recipient need as qualification, it would provide assistance "at least to some who are not in need" and would thus violate the gift clause).

[¶24] In resolving taxpayer challenges to the constitutionality of statutes authorizing government spending, we have said "where the constitutionality

8

of a statute depends upon the power of the legislature to enact it, its validity must be tested by what might be done under color of the law and not what has been done." *Herr v. Rudolf*, 75 N.D. 91, 103, 25 N.W.2d 916, 922 (1947) (citing *State v. Stark County*, 14 N.D. 368, 103 N.W. 913 (1905)). Because the Act requires the State to release all royalties, under both enforceable claims and previously-lapsed claims, it necessarily includes transactions that are without legal obligation and thus we must determine whether those transactions are prohibited "donations." Accordingly, despite having constitutional application to unexpired claims, in the context of a taxpayer challenge under the gift clause, we conclude the Plaintiffs' facial challenge does not fail merely because the statute includes constitutional applications along with potentially unconstitutional applications.

B

[¶25] The gift clause of the North Dakota Constitution provides:

> The state, any county or city may make internal improvements and may engage in any industry, enterprise or business, not prohibited by Article XX of the Constitution, but neither the state nor any political subdivision thereof shall otherwise loan or give its credit or make donations to or in aid of any individual, association or corporation except for reasonable support of the poor, nor subscribe to or become the owner of capital stock in any association or corporation.

N.D. Const. art. X, § 18. Section 61-33.1-04(1)(b), N.D.C.C., provides that within six months after adoption of the acreage determination by the Land Board:

> Any royalty proceeds held by the board of university and school lands attributable to oil and gas mineral tracts lying entirely above the ordinary high water mark of the historical Missouri riverbed channel on both the corps survey and the state phase two survey must be released to the relevant operators to distribute to the owners of the tracts, absent a showing of other defects affecting mineral title.

9

This section applies retroactively to all wells spud after January 1, 2006, for purposes of oil and gas mineral and royalty ownership. 2017 N.D. Sess. Laws ch. 426, § 4.

[¶26] The Plaintiffs identify four categories of state-owned funds or property which they claim the Act gives away to private individuals in violation of the gift clause. The categories are: (1) leases and leased mineral acres; (2) unleased mineral acres; (3) $187 million in the Strategic Investments and Improvements Fund ("SIIF"); and (4) $18 million escrowed because of royalty disputes. The district court's analysis of section 61-33.1-04(1)(b) implicates only category 3, the royalty proceeds held in the SIIF. Because the Plaintiffs cross-appeal the district court's rejection of their facial challenge to the chapter as a whole, we must also consider the chapter's application to the other categories of money or property. The Defendants argue the State had no protectable interest in the property that could be given away and that reviving claims against the State barred by the statute of limitations does not implicate the gift clause.

[¶27] The district court interpreted N.D.C.C. § 61-33.1-04(1)(b) to require the Land Board to transfer State funds from the SIIF to newly adjudicated mineral owners without consideration to the State because its retroactivity to 2006 effectively extended the statute of limitations, reviving claims against the State that were barred before the Act became effective. The relevant statute of limitations is N.D.C.C. § 28-01-22.1, under which any action against the state, state employees or state officials "must be commenced within three years after the claim for relief has accrued." The district court reasoned that any royalty proceeds subject to claims that had lapsed under the three-year statute of limitations were indisputably owned by the State because they were no longer subject to any legally enforceable claim. It concluded that by directing payment of money to private parties under lapsed and unenforceable claims, section 61-33.1-04(1)(b) violates on its face the constraints of N.D. Const. art. X, § 18. The district court also concluded there was no constitutional violation presented by the other provisions of the Act, either with respect to the funds in the SIIF or to the other categories of property interests asserted as prohibited gifts.

[¶28] The issue before us is whether refunds under section 61-33.1-04(1)(b) or other provisions of the Act directing transfer or release of the State's interest in these four classes of property constitute "donations" prohibited by the gift clause.

[¶29] We first consider the ordinary meaning of "donation" at the time the provision was enacted. The phrase "make donations to or in aid of any individual, association or corporation" appeared in the original 1889 constitution, then numbered Section 185. *Haugland v. City of Bismarck,* 2012 ND 123, ¶ 26, 818 N.W.2d 660. Dictionaries of the era defined "donation" by reference to the Latin word donatio, meaning "[t]he act by which the owner of a thing voluntarily transfers the title and possession of the same from himself to another person, without any consideration." Bouvier, *A Law Dictionary* 559 (15th ed. 1883); Black, *A Dictionary of Law* 389 (1st ed. 1891) (same); *Webster's Complete Dictionary* 404 (1886 ed.) (quoting Bouvier for definition used in law and providing common definition as "[t]hat which is given or bestowed; that which is transferred to another gratuitously, or without a valuable consideration; a gift; a grant."). These consistent definitions comport with the modern usage of "donation" and provide a reliable starting point in determining how the term would have been used and understood by those who drafted and adopted the provision. *See Wilkens v. Westby*, 2019 ND 186, ¶ 8, 931 N.W.2d 239 ("Using dictionaries close in time to the enactment of a statute is helpful in determining substantive meaning.").

[¶30] When the North Dakota Constitution was adopted, New York had a provision that was "nearly identical in language with section 185." *Erskine v. Steele Cty.*, 87 F. 630, 636 (C.C.D.N.D. 1898), *aff'd*, 98 F. 215 (8th Cir. 1899). Authoritative interpretations of gift clauses in other state constitutions that predated adoption of the North Dakota constitution in 1889 are particularly persuasive. "Courts in construing constitutional or statutory provisions which have been taken from another state almost invariably hold that the Legislature or the Constitution makers are presumed to have adopted it with knowledge of the construction or interpretation given it by the courts of the state whence it comes, and therefore to have adopted such construction or interpretation."

11

*State ex rel. McCue v. Blaisdell*, 18 N.D. 31, 119 N.W. 360, 365 (1909). New York amended its constitution in 1875 to forbid gift or loan of the money of the state. *Trustees of Exempt Firemen's Benev. Fund of City of New York v. Roome*, 93 N.Y. 313, 316 (1883). Interpreting this clause soon after its adoption, New York's high court considered a gift clause challenge to a statute authorizing payment to firemen "after the service ended, and when there was no legal or equitable obligation operating upon the State." *Id.* at 326. The court concluded the historical circumstances showed the payment was not a prohibited donation, but discharge of an honorable obligation, analogizing to payment of a debt discharged in bankruptcy:

> If a merchant fails in business and compromises with his creditors for a part only of their debts, or is discharged in bankruptcy with a small dividend, and thereafter being fortunate and becoming rich, calls his old creditors together, and gives to each principal and interest of the discharged balance, he does what he is not obliged to do, what neither law nor equity could compel, but he does not make a gift or dispense a charity. A purely moral obligation rests upon him, which he may or may not heed, but if he does, it characterizes his act, and makes that an honest payment of an honest debt which otherwise would have been a charity and a gift.

*Roome*, 93 N.Y. at 326.

[¶31] *Roome* did not characterize the appropriation for the firemen as supported by only a moral obligation without past consideration supporting it. As a result of technological and organizational changes in firefighting, many firemen were discharged from service, although "they stood ready to serve their full terms." *Id.* at 325. The court explained that the payment to the firemen after their service had ended was "an honorable obligation founded upon their past services and the injuries and suffering which those had occasioned." *Id.* at 326. The court concluded the payment of public money to the exempt firemen was not a gift or donation prohibited by the state constitution: "the constitutional provision was not intended and should not be construed to make impossible the performance of an honorable obligation founded upon a public service, invited by the State, adopted as its agency for doing its work, and

12

induced by exemptions and rewards which good faith and justice require should last so long as the occasion demands." *Id*. at 327.

[¶32] After North Dakota adopted its gift clause, at least two states considered whether payment of a claim against the state that is no longer legally enforceable is a donation under a similar constitutional provision. In *Bickerdike v. State*, the Supreme Court of California considered legislation waiving the defense of a statute of limitations for claims that had expired several years prior to passage of the act. 78 P. 270, 275 (Cal. 1904). The court concluded waiver of the limitations defense was not a gift within the meaning of the constitutional provision because the defense did not extinguish the underlying debt obligation but only barred remedy in court. "The payment of such a debt by the debtor is not a 'gift,' in any proper sense of the word, and there is nothing in the constitutional provision invoked that can be held to prohibit the legislature from paying these claims." *Id*.

[¶33] The Supreme Court of Wyoming has also considered a challenge under a provision forbidding the state to "make donations to or in aid of any individual . . . except for necessary support of the poor." *State v. Carter*, 30 Wyo. 22, 29, 215 P. 477, 479 (1923). The Wyoming legislature had appropriated three thousand dollars for relief of the widow of an undersheriff who had been killed in the line of duty. Considering the claim that this was an unconstitutional donation, the court explained:

> In a sense, of course, every payment not legally enforceable might be said to be a gift. But courts have not, generally, construed that term as broadly as that. *A claim paid after it is barred by the statute of limitation is not considered a gift, but the recognition of a moral right*, and, when the existence thereof is acknowledged after the statute has run, it may even be enforced in an action at law. And it is generally held that, to be a claim which a state may recognize, it need not be such as is legally enforceable, but may be a moral claim, one based on equity and justice.

*Id*. (emphasis added).

13

[¶34] This Court has previously said that "a moral or equitable obligation on the state" may support a transfer lacking any money or other consideration. *Solberg v. State Treasurer*, 78 N.D. 806, 814, 53 N.W.2d 49, 53 (1952). In *Solberg*, we found no sufficient moral or equitable obligation supported a finding of consideration for the release of a reservation of mineral rights. *Id.* at 53-54. In that case, the State conveyed land subject to a 50% mineral reservation for an agreed price that accounted for the reserved minerals. *Id.* at 50. The State never had a legal obligation to convey the 50% mineral interest it reserved, and thus we concluded the legislation gratuitously conveying this mineral interest to the surface owner was void under the gift clause. *Id.* at 53-54. We also considered "moral" consideration, finding none, when interpreting "donation" in *Petters & Co. v. Nelson County*, 68 N.D. 471, 480, 281 N.W. 61, 65 (1938). As in *Solberg*, and unlike the situation here, the State had no prior legal obligation to pay the plaintiff's claim. Rather than paying a previously valid claim to which the State had a statutory defense, the statute at issue in *Petters & Co.* created a new obligation, which the Court held would "constitute a donation, a pure and simple gratuity, unsupported by any consideration, legal, equitable, or moral." *Id.*

[¶35] These cases are consistent with the underlying rule of law found in the field of contracts, which for centuries has recognized the concept of moral obligations providing legal consideration to support formation of a contract— but only a contract related to the obligation. One prominent treatise explains the history of consideration based on a moral obligation as follows:

> Beginning about the middle of the 18th Century, the term "moral obligation" as a kind of past consideration that would validate a subsequent promise to fulfill the obligation gained currency. This theory of moral consideration was applied in various cases during the latter half of the 18th Century; thus, a promise by overseers of the poor to pay for expenses incurred in curing a pauper was upheld, as was a promise by an executor, having assets sufficient for the purpose, to pay a pecuniary legacy. Courts also upheld a promise to pay the legal portion of a usurious debt on the ground that the promisor was morally obliged to do so, and a promise by a widow to indemnify one who had advanced money to another at

her request during her coverture when she was incapable of contracting was upheld on similar grounds.

However, about the beginning of the 19th Century courts began to restrict the doctrine of moral consideration, out of concern for the fact that enforcement of such promises would lead to an unacceptable breadth of promissory liability. In the words of one court, "The enforcement of such promises by law, however plausibly reconciled by the desire to effect all conscientious engagements, might be attended with mischievous consequences to society, one of which would be the frequent preference of voluntary undertakings to claims for just debts. Suits would thereby be multiplied, and voluntary undertakings would also be multiplied, to the prejudice of real creditors. The temptations of executors would be much increased by the prevalence of such a doctrine, and the faithful discharge of their duty be rendered more difficult." The rule thus developed that an express promise could only give rise to liability if there had previously been a consideration which would have given rise to an implied promise which might have been enforced by an action at law but for some technical bar.

4 Williston on Contracts § 8:14 (footnotes omitted).

[¶36] These nineteenth-century restrictions on the concept of moral consideration were included in the 1877 territorial code, and the provision remains materially unchanged in the century code today. N.D.C.C. § 9-05-02 ("An existing legal obligation resting upon the promisor, or a moral obligation originating in some benefit conferred upon the promisor or prejudice suffered by the promisee, also is a good consideration for a promise to an extent corresponding with the extent of the obligation, but no further or otherwise."). Like the law of contract, the holding we announce today is limited to those obligations that existed at law and would have been enforceable against the State but for a technical bar such as the statute of limitations.

[¶37] The Defendants argue broadly that the State may extend a statute of limitations without implicating constitutional limits, but cite only cases addressing constitutional challenges under the due process clause, such as *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 229 (1995). These cases are

distinguishable because the constitutional issue was whether the state could extend a statute of limitations and revive a lapsed claim against a private party. *Id.* (explaining "a statute of limitations . . . can be extended, without violating the Due Process Clause, after the cause of the action arose and even after the statute itself has expired"). Where vested property interests are implicated, a defendant may have a due process interest that limits retroactive extension of a statute of limitation. *See Interest of W. M. V.*, 268 N.W.2d 781, 786 (N.D. 1978) (rejecting due process challenge to statute reviving claims previously barred because challenger had no vested rights). Here, no due process issue is presented, because the State has extended the statute of limitation to claims against itself and it cannot be said to violate its own due process rights by enacting a statute. *See Schoon v. NDDOT*, 2018 ND 210, ¶ 23, 917 N.W.2d 199; *Ruotolo v. State*, 631 N.E.2d 90, 96-97 (N.Y. 1994) (rejecting argument that the legislature may violate the state's due process rights by enacting a law reviving unenforceable claims). But whether the Act is consistent with due process does not answer whether it may violate the gift clause by releasing funds the state had no legal obligation to pay.

[¶38] We hold that where the State has a legal obligation that becomes unenforceable by the passage of a statute of limitations, the Legislative Assembly may waive or extend the limitation period to revive a previously valid claim against the State without making a prohibited "donation" within the meaning of the gift clause.

[¶39] We now apply this framework to the Plaintiffs' claims about release of royalties from the SIIF, which the district court concluded was a prohibited gift. Claims to the royalty proceeds held by the Land Board may be divided into two groups: those funds subject to claims that had lapsed prior to the effective date of the Act, and those funds subject to claims that had not lapsed.

[¶40] The money in the SIIF that the State is required to release under § 61-33.1-04(1)(b) is in the SIIF because the State was paid royalties under leases of minerals that it once claimed but now by statute no longer claims. This section requires those funds be released to the operating oil company for payment to the mineral owners determined under the Act. We reject the

16

Plaintiffs' argument that the gift clause requires the State to rely on the statute of limitations and keep money it was paid for leasing minerals it now acknowledges it does not own and should not have leased. Although the State may have a legal defense under the statute of limitations, it also has a moral obligation to pay its just debts and deal fairly with the people. These funds have accrued since 2006 and have been held separately from other funds, so no new revenue will have to be raised to pay these claims. We conclude the State may through legislation recognize this obligation and return funds from the SIIF without making a prohibited "donation" under the gift clause.

[¶41] In their cross-appeal, the Plaintiffs argue the district court erred in concluding there was no gift clause violation by the Act's disclaimer of interests in leases, leased mineral acres, unleased mineral acres, and $18 million escrowed because of royalty disputes. These claims turn on whether the State ever had a legal interest such that disclaimer of that interest could constitute a prohibited donation.

[¶42] Under the equal-footing doctrine, North Dakota acquired title to the bed of the Missouri River up to its ordinary high water mark at the time North Dakota was admitted to the union. *Reep v. State*, 2013 ND 253, ¶ 14, 841 N.W.2d 664. Citing *Oregon ex. rel. State Land Bd. v. Corvallis Sand & Gravel Co.*, 429 U.S. 363, 371-72, 376 (1977), the district court concluded that the equal-footing doctrine vested the State with title to the bed of the Missouri River as it existed at the time of statehood, but that since statehood, the equal-footing doctrine does not determine how the changing footprint of the river over time affects title to the riverbed. Instead, how the changing riverbed affects the State's title is controlled by state law, including the public trust doctrine.

[¶43] The public trust doctrine was first recognized by this Court in *United Plainsmen v. N.D. State Water Conservation Commission*, 247 N.W.2d 457 (N.D. 1976). In *United Plainsmen*, this Court stated N.D.C.C. § 61-01-01 expresses the public trust doctrine. *Id.* at 462. Under the public trust doctrine, the State holds title to the beds of navigable waters in trust for the use and enjoyment of the public. This Court has said fostering the public's right of navigation is traditionally the most important feature of the public trust

doctrine. *J.P. Furlong Enterprises, Inc. v. Sun Exploration and Production Co.*, 423 N.W.2d 130, 140 (N.D. 1988). We have also recognized other interests served by the public trust doctrine, such as bathing, swimming, recreation and fishing, as well as irrigation, industrial and other water supplies. *Id.* (recognizing that legislation may modify this common law doctrine).

[¶44] The Submerged Lands Act, 43 U.S.C. § 1301 – 1356b, generally confirms state ownership of the title to the beds of navigable waters as against any claim of the United States. 43 U.S.C. § 1311. But from this broad confirmation of state authority, it excepts "all lands acquired by the United States by eminent domain proceedings, purchase, cession, gift, or otherwise in a proprietary capacity." 43 U.S.C. § 1313(a). The federal government acquired the bed of Lake Sakakawea above the historical OHWM by purchase or eminent domain so that it could be inundated by the Garrison Dam. Under § 1313 of the Submerged Lands Act, the land taken by the federal government for the Garrison Dam project is owned by the United States.

[¶45] Under the Supremacy Clause, U.S. Const. art. VI, cl. 2, the laws of the United States are the supreme law of the land, and any state law that conflicts with federal law is without effect. *Home of Economy v. Burlington N. Santa Fe R.R.*, 2005 ND 74, ¶ 5, 694 N.W.2d 840. The Plaintiffs present several arguments as to how the State obtained ownership of the disputed minerals, including by implication of the watercourses clause of the state constitution, by self-executing transfer under the Sovereign Lands Act, N.D.C.C. § 61-33-03, and the common law public trust doctrine first recognized in *United Plainsmen*. The Flood Control Act of 1944 authorized construction of the Garrison Dam and acquisition of the land that would be subject to inundation by the reservoir. Any contrary state law, including the constitution, a statute, or the common law, which purports to vest in the State the legal ownership of the bed of Lake Sakakawea is preempted under the Supremacy Clause to that extent.

[¶46] The federal government acquired through purchase or eminent domain both the surface and mineral estate to much of the affected area, but it allowed some landowners to reserve their mineral interests during the acquisition

phase. Since the federal government's acquisition under authority of the Flood Control Act of 1944, the prior landowners' reservation of mineral interests has remained in the chain of title. The Submerged Lands Act expressly excepts from an otherwise broad assignment to states of the lands beneath navigable waters those lands acquired by the United States by eminent domain or purchase. 43 U.S.C. §§ 1311, 1313. These federal laws preempt operation of any state law that would otherwise vest ownership in the state, including chapter 61-33 and the public trust doctrine. As a result, we conclude the lakebed above the historic OHWM and accompanying mineral estates were never the State's to "give away." The State does not violate the gift clause by transferring property or renouncing claims to property that it does not own in the first instance. Because the State cannot give away that which it does not own, we hold the Act does not violate the gift clause of the North Dakota Constitution to the extent that it renounces claims to leases, leased mineral acres and unleased mineral acres in the affected area. The Defendants' release of claims to funds held in escrow as a result of royalty disputes is derivative of its claims to the leases and leased mineral acres and would not be subject to a statute of limitation defense and so also does not violate the gift clause.

C

[¶47] The Plaintiffs argue the district court erred in concluding N.D.C.C. ch. 61-33.1 does not violate N.D. Const. art. XI, § 3 ("the watercourses clause").

[¶48] The watercourses clause provides, "All flowing streams and natural watercourses shall forever remain the property of the state for mining, irrigating and manufacturing purposes." N.D. Const. art. XI, § 3. The word "remain" in the text of the watercourses clause reinforces the principle that the State's ownership of flowing streams and natural watercourses was fixed at statehood. *See Riemers v. Eslinger*, 2010 ND 76, ¶ 11, 781 N.W.2d 632 (emphasizing the word "remain" in concluding the scope of the jury trial right was fixed at statehood by N.D. Const. art. I, § 13, which guarantees "the right to a jury trial 'shall . . . *remain* inviolate'" (quoting *City of Bismarck v. Fettig*, 1999 ND 193, ¶ 11, 601 N.W.2d 247)); *State v. Lohnes*, 69 N.W.2d 508, 512-13 (N.D. 1955) (*overruled on other grounds*) (emphasizing use of "remain" in the

enabling act and section 203 of the constitution to emphasize that state and federal jurisdiction over Indian lands was fixed at statehood). We conclude the watercourses clause operated to vest in the State ownership of watercourses which existed at statehood, but does not operate to vest in the State watercourses that become navigable after statehood, such as Lake Sakakawea.

[¶49] This is consistent with this Court's prior interpretation of the watercourses clause. For example, in *Ozark-Mahoning Co. v. State*, 76 N.D. 464, 37 N.W.2d 488 (1949), this Court held that the watercourses clause applies only to watercourses which were navigable upon North Dakota's admission to the United States. There, the State appealed from a judgment quieting title to the bed of Grenora Lake in favor of the riparian owners of the lots abutting the meander lines around the lake. *Id.* at 489-90. The State argued that only it could own the lakebed under the watercourses clause. *Id.* at 492-93. Because no evidence showed that Grenora Lake was navigable when North Dakota was admitted to the United States, the Court affirmed the judgment in favor of the landowners. *Id.* at 493. Citing *Bigelow v. Draper*, 6 N.D. 152, 69 N.W. 570 (1896), the Court explained that under the common law of Dakota Territory when North Dakota was admitted to the United States, "the owner of land through which a nonnavigable stream flowed was possessed of the title to the bed of the stream." The watercourses clause was interpreted to apply only to those watercourses that were navigable at statehood because an interpretation that would divest the rights of riparian owners to the beds of watercourses that were not navigable in fact at statehood would violate the Fourteenth Amendment to the U.S. Constitution. *Id.*

[¶50] Here, the stipulated facts reflect that the land from the bank of the Missouri River up to an elevation of 1854 feet mean sea level was acquired by the Corps for impounding water by operation of the Garrison Dam. The area above the banks of the Missouri River was not navigable when North Dakota was admitted to the United States. Because the affected area was not navigable at statehood, and became navigable only when inundated by operation of the Garrison Dam beginning in 1953, we conclude N.D.C.C. ch. 61-33.1 does not violate the watercourses clause.

D

[¶51] The Plaintiffs argue the district court erred in concluding N.D.C.C. ch. 61-33.1 does not violate sections 21 and 22 of the North Dakota Constitution. Article I, § 21, provides:

> No special privileges or immunities shall ever be granted which may not be altered, revoked or repealed by the legislative assembly; nor shall any citizen or class of citizens be granted privileges or immunities which upon the same terms shall not be granted to all citizens.

Article I, § 22, N.D. Const., provides:

> All laws of a general nature shall have a uniform operation.

[¶52] The state constitution "does not prohibit legislative classifications or require identical treatment of different groups of people." *Larimore Pub. Sch. Dist. No. 44 v. Aamodt*, 2018 ND 71, ¶ 34, 908 N.W.2d 442 (citing *State v. Leppert*, 2003 ND 15, ¶ 7, 656 N.W.2d 718). In *MCI Telecommunications Corp. v. Heitkamp*, 523 N.W.2d 548, 552 (N.D. 1994), this Court distinguished between general laws and special laws, and stated that "[s]pecial laws are made for individual cases of less than a class, due to peculiar conditions and circumstances[,]" while general laws "appl[y] to all things or persons of a class." This Court then stated, "Reasonable classification does not violate the special laws provision of the North Dakota Constitution." *Id.* at 553. "A statutory classification challenged under the special laws provision of our constitution is . . . to be upheld if it is natural, not arbitrary, and standing upon some reason having regard to the character of the legislation of which it is a feature." *Id.*

[¶53] The Plaintiffs cite *Solberg v. State Treasurer*, 78 N.D. 806, 816-17, 53 N.W.2d 49, 55 (1952), for the proposition that the Act denies equal protection to the many by distributing state-owned assets to the few. In *Solberg*, this Court's holding was limited to the gift clause. *Id.* The Plaintiff's equal protection argument is simply a repackaging of the Plaintiffs' gift clause argument which we rejected in section III-B above.

21

[¶54] The Plaintiffs also argue the Act created an unconstitutionally arbitrary classification by distinguishing between wells spud before and after January 1, 2006. The record reflects January 2006 was the approximate time oil and gas production began under Lake Sakakawea via horizontal drilling. Therefore, the Act's retroactive application to January 1, 2006, reflects a rational line dividing periods with different economic and industrial characteristics and is not arbitrary. Because the Act did not create an unconstitutional classification, we hold that the district court did not err in concluding it does not violate N.D. Const. art. I, §§ 21 and 22.

E

[¶55] The Plaintiffs argue the district court erred in concluding N.D.C.C. ch. 61-33.1 does not violate the public trust doctrine.

[¶56] In North Dakota, a mineral estate severed from the surface estate charges the surface estate owner with an implied servitude for the owner or lessee of the mineral estate to develop the minerals. *Krenz v. XTO Energy, Inc.*, 2017 ND 19, ¶ 42, 890 N.W.2d 222 (citing *Hunt Oil Co. v. Kerbaugh*, 238 N.W.2d 131, 135 (N.D. 1979)). Because the mineral estate is dominant over the surface estate, easements implied by private mineral ownership under a navigable waterway would offend the public trust if the mineral owner's easement is in conflict with and superior to the State's trust interest. However, as discussed above, the federal government holds title to the lakebed of Lake Sakakawea, and its interest supersedes the State's public trust interest under the Supremacy Clause. Because the federal government, rather than the State, holds title to the lakebed outside the historical river channel, the public trust is not implicated by private mineral ownership under Lake Sakakawea. Because the public trust doctrine is a common law principle, it cannot invalidate a statute that is not prohibited by the constitution. N.D.C.C. § 1-01-06; § 1-02-01; *Verry v. Trenbeath*, 148 N.W.2d 567, 571 (N.D. 1967). We conclude the district court did not err in concluding N.D.C.C. ch. 61-33.1 does not violate the public trust doctrine.

IV

[¶57] The Defendants argue that the district court abused its discretion in awarding attorney's fees, costs, and service fees. The Plaintiffs also argue on cross-appeal that the district court abused its discretion in its calculation of attorney's fees, costs, and service fees. A district court's decision on attorney's fees is reviewed under the abuse of discretion standard. *Rocky Mountain Steel Foundations, Inc. v. Brockett Company, LLC*, 2019 ND 252, ¶ 7, 934 N.W.2d 531 (citing *Lincoln Land Dev., LLP v. City of Lincoln*, 2019 ND 81, ¶ 20, 924 N.W.2d 426).

[¶58] North Dakota courts generally apply the "American Rule" for attorney's fees and assume each party to a lawsuit will bear its own attorney's fees. *Rocky Mountain Steel Foundations*, 2019 ND 252, ¶ 9, 934 N.W.2d 531 (citing *Deacon's Dev., LLP v. Lamb*, 2006 ND 172, ¶ 11, 719 N.W.2d 379). "[S]uccessful litigants are not allowed to recover attorney fees unless authorized by contract or by statute." *Id.* As an exception to the American Rule, a lawyer who recovers a common fund for the benefit of persons other than himself or his client may be entitled to reasonable attorney's fees from the fund as a whole. *Ritter, Laber & Assocs., Inc. v. Koch Oil, Inc.*, 2007 ND 163, ¶ 27, 740 N.W.2d 67 (citing *Horst v. Guy,* 211 N.W.2d 723, 732 (N.D.1973)).

[¶59] The award of attorney's fees was not authorized by contract or statute. As a result of our decision, the Plaintiffs did not recover a common fund for the benefit of others and are therefore not entitled to attorney's fees under the common fund doctrine. We reverse the award of attorney's fees. Under N.D.C.C. § 28-26-06, costs are taxed in favor of the prevailing party. Because we reverse the portion of the summary judgment finding application of N.D.C.C. § 61-33.1-04(1)(b) unconstitutional, the Plaintiffs are no longer prevailing parties. We reverse the award of costs.

[¶60] As a result of our decision here the Plaintiffs are no longer prevailing parties, and therefore no theory supports a service award. Because we reverse the portion of the summary judgment on which the Plaintiffs initially

prevailed, we also reverse the district court's grant of the requested service award.

V

[¶61] We affirm the district court's order denying the Defendants' N.D.R.Civ.P. 19(b) motion to dismiss. We affirm that part of the court's judgment concluding the Plaintiffs have not demonstrated N.D.C.C. ch. 61-33.1 is facially unconstitutional. We reverse the order granting an injunction and reverse the judgment to the extent it concludes the release of lease and bonus refunds authorized under N.D.C.C. § 61-33.1-04(1)(b) would result in unconstitutional gifts under N.D. Const. art. X, § 18, and to the extent it awards to the Plaintiffs attorney's fees, costs, and service awards.

[¶62]  Jerod E. Tufte
        Norman G. Anderson, S.J.
        Gerald W. VandeWalle
        Jon J. Jensen, C.J.

[¶63] The Honorable Norman G. Anderson, Surrogate Judge, sitting in place of McEvers, J., disqualified.

**Crothers, Justice, specially concurring.**

[¶64] I generally agree with the majority opinion. I write separately to make clear my view that the rationale underpinning Part III (B) is not naked authority for the State to appropriate funds for any cause describable as a "moral obligation." Rather, in the context of our constitutional gift clause, permissible appropriations are limited to circumstances where a legal obligation exists, even though the obligation may not be presently enforceable for reasons such as the statute of limitations.

[¶65] The majority opinion seems to acknowledge the limitation about which I write, including citations to judicial decisions from California and Wyoming. *See* majority opinion, at ¶¶ 31-32. In those cases, legal claims against the state existed but could not be asserted due to the passage of time. *Id.* The states essentially waived the statute of limitations and the respective state's highest

24

courts held the waiver was not a violation of their gift clauses restrictions. *Id.* However, the majority opinion also cites *The Trustees of the Exempt Firemen's Benev. Fund of the City of New York v. Roome,* 93 N.Y. 313, 316 (1883). There, New York interpreted its constitutional gift clause as authorizing a statute directing payment to firemen "after the service ended, and when there was no legal or equitable obligation operating upon the State." *Id.* at 326. In *Roome,* the obligation was purely moral. No legal obligation existed before passage of the law at issue. I therefore would not cite or rely on the *Roome* decision as persuasive authority for interpretation of North Dakota's gift clause.

[¶66] Daniel J. Crothers
      Jon J. Jensen, C.J.